<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1

Benesch, Friedlander, Coplan & Aronoff LLP
Michael J. Barrie (NJ No. 033262000)
Kevin M. Capuzzi (NJ No. 173442015)
Daniel N. Brogan (NJ No. 042592012)
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, NJ 07601-6323
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
kcapuzzi@beneschlaw.com
dbrogan@beneschlaw.com

*Counsel to CPIF MRA, LLC*

In re:

14 VESEY PARTNERS (DEL) LLC,

Debtor.

In re:

JTRE 14 VESEY LLC,

Debtor.

</td><td>

Chapter 11

Case No. 24-12086 (MBK)

Judge: Michael B. Kaplan

Chapter 11

Case No. 24-12087 (MBK)

Judge: Michael B. Kaplan

**Hearing Date: April 4, 2024**

</td></tr>
</table>

**MOTION OF CPIF MRA, LLC TO DISMISS THESE CHAPTER 11
CASES WITH PREJUDICE OR, IN THE ALTERNATIVE,
FOR RELIEF FROM THE AUTOMATIC STAY**

CPIF MRA, LLC ("Lender"),[1] by and through its undersigned counsel, Benesch,

Friedlander, Coplan & Aronoff LLP, hereby moves (this "Motion") this Court, for entry of an

---

[1] Lender is the assignee and successor-in-interest to the original lender, CPIF Lending, LLC ("CPIF Lending" or "Original Lender"). On or about May 19, 2021, CPIF Lending assigned all of its right, title, and interest in, to, and under the Initial Loan Documents (as defined herein) to Lender. Unless expressly stated otherwise, references in this Motion to "Lender," shall refer, collectively, to CPIF MRA, LLC, and CPIF Lending, LLC. True and correct copies

order, a proposed form of which is attached hereto as **Exhibit 1**, (i) dismissing the chapter 11 cases

of the above-captioned debtors (the "Debtors") for cause and with prejudice pursuant to sections

105(a), 305(a), 349(a) and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"),

or, in the alternative, (ii) granting relief from the automatic stay pursuant to sections 362(d)(1) and

(d)(2) of the Bankruptcy Code.  In support of this Motion, Lender submits the accompanying

Declaration of Robert Shields dated March 8, 2024 (the "Shields Dec."), and the exhibits annexed

thereto, and respectfully states as follows:

## **PRELIMINARY STATEMENT**[2]

1.      At 9:18 a.m. on February 28, 2024, Vesey Partners filed its petition for relief under

Chapter 11 of the Bankruptcy Code.[3]  The moment chosen for that filing was no coincidence—the

petition was filed ***less than fifteen minutes*** before Lender was set to foreclose on all issued and

outstanding equity in JTRE 14 Vesey that was pledged to Lender by Vesey Partners as part of the

collateral securing approximately $28 million of indebtedness owed by the Debtors to Lender.

2.      Unsurprisingly, the moment chosen also lays bare Debtors' true purpose for filing

these cases: while they may be masquerading as an attempt at reorganization, they are actually

nothing more than a last-ditch attempt to misuse the bankruptcy process and further delay the

inevitable.  The broader timeline is telling.  These cases were filed over ten months after the

Debtors first defaulted on the Loans, over two months after Lender commenced an action in New

York state court to appoint a receiver over the Mortgaged Property, only one day after JTRE 14

---

of the documents evidencing this assignment are attached as Exhibits 8-10 to the Shields Declaration filed
contemporaneously herewith.
[2] As context requires, capitalized terms used in this Preliminary Statement have the meaning given elsewhere in this
Motion.
[3] JTRE 14 Vesey's petition for relief followed at 9:39 a.m. and, at 9:50 a.m., Vesey Partners filed an amended petition
for relief.

Vesey filed a motion to dismiss Lender's action to appoint a receiver, and just twelve minutes
before Lender would have acquired the equity in JTRE 14 Vesey.

3.        That the Debtors filed these cases solely to trigger the automatic stay and further
their campaign of frivolous and dilatory litigation is even further apparent by the underlying facts.
Neither Debtor is an operating company.  As admitted in its petition, JTRE 14 Vesey is a single
asset real estate entity that exists only to own the Mortgaged Property. The Mortgaged Property is
its only asset.  Vesey Partners, in turn, is a special purpose entity that exists only to hold the equity
interests in JTRE 14 Vesey as part of the collateral package securing Lender's interest in the
Mortgaged Property.  Those equity interests are its only asset.  The Mortgaged Property itself is
unoccupied, non-operational, and generates no revenue.  Given that lack of cash flow, it is
unknown how the Debtors intend to, or if they even could, finance these cases.  Indeed, the
Debtors' filing was not accompanied by any first-day motions or affidavits, and they have not
given any indication of their purpose for filing these cases or what reorganization they hope to
achieve by doing so.[4]  To put it bluntly, that is because these cases cannot possibly achieve any
legitimate reorganizational purpose.

4.        At bottom, these cases bear all indicia of a bad faith filing and they should be
dismissed.  In the alternative, cause exists to terminate the automatic stay and allow the Lender to
promptly enforce the remedies to which it is entitled.

## JURISDICTION AND VENUE

5.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.
This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of these cases and this Motion are
proper under 28 U.S.C. §§ 1408 and 1409.

---

[4] It is unclear if the Debtors even had the proper corporate authority to file these cases.  *See* D.I. 1, David Glasswater
as "VP Restructuring".

6.      The statutory predicates for the relief sought herein are sections 105(a), 305(a)(1), 349(a), 362(d)(1), 362(d)(2), and 1112(b) of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), including Bankruptcy Rules 1017, 2002, 4001, 9013, and 9014, and D.N.J. LBR 4001-1, 9013-1, 9013-2, and 9013-4.

## BACKGROUND

### I.      PROCEDURAL BACKGROUND

7.      On February 28, 2024 (the "Petition Date"), 14 Vesey Partners (DEL) LLC ("Vesey Partners") and JTRE 14 Vesey LLC ("JTRE 14 Vesey" and collectively with Vesey Partners, the "Debtors" and each, a "Debtor") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing these chapter 11 cases.[5]

8.      As of the date of this Motion, no request has been made for the appointment of a trustee or examiner and no statutory creditors' committee has been appointed.

### II.     THE LENDER'S FIRST LIEN SECURED LOANS TO DEBTORS

9.      Prior to the Petition Date, Lender (as successor to CPIF Lending, referred to herein as "Original Lender")  made three loans (collectively, the "Loans") totaling total commitment of $28,039,798.80 to JTRE 14 Vesey that are evidenced by, among other things, (i) that certain Acquisition Loan Agreement, dated as of April 22, 2021 (as amended, supplemented, or otherwise modified from time to time, the "Acquisition Loan Agreement") with Original Lender; (ii) that certain Consolidated, Amended and Restated Promissory Note (Acquisition Loan), dated April 22, 2021, in the original principal amount of $18,050,000.00 (as amended, supplemented, or otherwise modified from time to time, the "Acquisition Note"); (iii) that certain Building Loan Agreement, dated as of April 22, 2021 (as amended, supplemented, or otherwise modified from time to time,

---

[5] No joint administration motion has yet been filed.  Thus, this motion is being filed in each case.

the "Building Loan Agreement") with Original Lender; (iv) that certain Promissory Note (Building

Loan), dated April 22, 2021, in the original principal amount of $7,950,000.00 (as amended,

supplemented, or otherwise modified from time to time, the "Building Note"); (v) that certain Loan

Agreement, dated as of November 16, 2022 (as amended, supplemented, or otherwise modified

from time to time, the "Extension Loan Agreement," and together with the Acquisition Loan

Agreement and the Building Loan Agreement, the "Loan Agreements") with Lender; and (vi) that

certain Promissory Note, dated November 16, 2022, in the original principal amount of

$2,039,798.77 (as amended, supplemented, or otherwise modified from time to time, the

"Extension Note," and together with the Acquisition Note and the Building Note, the "Notes").

*See* Shields Dec. ¶ 5, Exs. 2-7.

10.     The Loans are secured by, among other things, (i) a Consolidated, Amended and

Restated Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing

(Acquisition Loan), dated as of April 22, 2021, which was recorded in the New York City

Department of Finance, Office of the City Register (the "Public Records") on May 7, 2021, as

Document Id. 2021000169358 (as amended or corrected, the "Acquisition Mortgage"); (ii) a

Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing (Building

Loan), dated as of April 22, 2021, which was recorded in the Public Records on May 26, 2021, as

Document Id. 2021000195404 (as amended or corrected, the "Building Mortgage"); and (iii) a

Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of

November 16, 2022, which was recorded in the Public Records on November 21, 2022, as

Document Id. 2022000429170 (as amended or corrected, the "Extension Mortgage," and together

with the Acquisition Mortgage and the Building Mortgage, the "Mortgages").  *See* Shields Dec. ¶

7, Exs. 8-10.

11.     The Mortgages encumber certain real, personal, and other property owned by JTRE 14 Vesey, including the mortgaged property (the "Mortgaged Property"), which is located in New York County, New York, commonly known as 14 Vesey Street, New York, New York 10007, and more particularly described in the Mortgages.  *See* Shields Dec. ¶ 8.

12.     In addition to the real and personal property of JTRE 14 Vesey securing the Loans, Lender holds a pledge of all issued and outstanding equity in JTRE 14 Vesey (the "Pledged Equity") pursuant to two substantively identical Pledge and Security Agreements, each dated as of April 22, 2021 (together, the "Pledge Agreements") and executed by Debtor Vesey Partners for the benefit of Original Lender.  *See* Shields Dec. ¶ 10; Exs. 11-1 & 11-2.  Vesey Partners is the sole member and 100% equity owner of JTRE 14 Vesey, which is a member-managed limited liability company.  *See* Shields Dec. ¶ 10.

13.     On or about May 19, 2021, Original Lender assigned all of its right, title, and interest in, to, and under the Initial Loan Documents,[6] including the Acquisition Mortgage and Building Mortgage, to Lender.  *See* Shields Dec. ¶ 12, Exs. 12-13.  Lender is the owner and holder of the subject first mortgage lien on the Mortgaged Property, as well as the other Loan Documents, and is the successor in interest to Original Lender for all purposes with respect to the Acquisition Loan and Building Loan and the Initial Loan Documents.  *See* Shields Dec. ¶ 14.

---

[6] As defined herein, the Acquisition Loan Agreement, Acquisition Note, Acquisition Mortgage, and all other documents evidencing, securing, or guarantying the Acquisition Loan, as each may be amended, modified, or corrected, are referred to herein as the "Acquisition Loan Documents."  The Building Loan Agreement, Building Note, and Building Mortgage, and all other documents evidencing, securing, or guarantying the Building Loan, as each may be amended, modified, or corrected, are referred to herein as the "Building Loan Documents" (and together with the Acquisition Loan Documents, the "Initial Loan Documents").  The Extension Loan Agreement, Extension Note, Extension Mortgage, and all other documents evidencing, securing, or guarantying the Extension Loan, as each may be amended, modified, or corrected, are referred to herein as the "Extension Loan Documents" (and together with the Initial Loan Documents, the "Loan Documents").

### III.    JTRE 14 VESEY DEFAULTS UNDER THE NOTES AND MORTGAGES

14.    As discussed more specifically herein, multiple Events of Default have occurred and are continuing under the Mortgages and other Loan Documents due to, among other things, JTRE 14 Vesey's failure to repay the Indebtedness (as defined in each set of Loan Documents) under each Note on or prior to the April 30, 2023 Maturity Date in accordance with Section 2.2 of the Notes (and JTRE 14 Vesey failed to satisfy the conditions precedent to exercising the "Extension Term" under any of the Notes when required).  *See* Shields Dec. ¶ 15.

15.    Specifically, each of the Loans matured on April 30, 2023 (the "Maturity Date"), and JTRE 14 Vesey failed to repay the Indebtedness (as defined in each of the Loan Documents) under the Notes on or prior to the Maturity Date in accordance with Section 2.2 of the Notes (and JTRE 14 Vesey failed to satisfy the conditions precedent to exercising the "Extension Term" under any of the Notes when required).  This constitutes a breach of section 2.1 of the Mortgages and an Event of Default under Section 7.1.1 and 7.1.3 of each Mortgage.  As of December 20, 2023, JTRE 14 Vesey owed Plaintiff a total of $27,847,153.17 under the Notes, which amounts have not been paid and have continued accruing interest at the default rate under the Loan Documents.  Shields Dec. ¶ 16.

16.    In addition to the maturity defaults, there are other events of default under the Mortgages, including (i) the failure to pay real estate taxes when due (*see* Shields Dec. ¶ 17, Exs. 2-4 (Mortgage) at Section 2.2), constituting Events of Default under Sections 7.1.3, 7.1.8 and 7.1.13 of each Mortgage; (ii) failure to properly maintain insurance coverage for the Mortgaged Property (*see* Shields Dec. ¶ 18, Exs. 2-4 (Mortgage) at Section 2.3), constituting Events of Default under Sections 7.1.3, 7.1.9 and 7.1.13 of each Mortgage; (iii) failure to adequately maintain the Mortgaged Property in good repair, order, and condition and failure to operate the Mortgaged

Property in the ordinary course of business in accordance with sound real estate management practices, including the performance of all ordinary and necessary maintenance and repairs (*see* Shields Dec. ¶ 19, Exs. 2-4 (Mortgage) at Section 2.4), constituting Events of Default under Sections 7.1.3, 7.1.7, and 7.1.13 of each Mortgage; and (iv) failure to timely pay contractors and other service providers with respect to services performed at the Mortgaged Property, which has resulted in several mechanic's liens being recorded on the Mortgaged Property (*see* Shields Dec. ¶ 21), constituting Events of Default under Sections 7.1.7, 7.1.8, and 7.1.9 of each Mortgage.

17.     JTRE 14 Vesey has breached each of the foregoing covenants in the Mortgages, and each of the breaches constitutes an Event of Default under each Mortgage. *See* Shields Dec. ¶ 22.

18.     The Mortgaged Property has had asbestos remediation performed and, upon information and belief, no replacement insulation was installed/reinstalled, such that the Mortgaged Property was not prepared for freezing temperatures. Shields Dec. ¶ 23. JTRE 14 Vesey has exposed the Mortgaged Property to inclement weather throughout the winter season and the Mortgaged Property has been and is presently at risk of material damage due to JTRE 14 Vesey's failure to properly winterize the Mortgaged Property. *Id.*

19.     The Mortgaged Property is currently unoccupied, has no tenants, and was undergoing renovations before such efforts were abandoned by JTRE 14 Vesey. Shields Dec. ¶ 24.

20.     Upon information and belief, due to the neglect of the Debtors and their management, the Mortgaged Property is now in disrepair and is not suitable for leasing or commercial use. *Id.*

21.     In essence, JTRE 14 Vesey has abandoned the Mortgaged Property and is no longer actively managing or protecting the Lender's collateral.  Shields Dec. ¶ 25.

22.     Lender notified JTRE 14 Vesey of its breaches of the Loan Documents via letter dated November 7, 2023 (the "November 7 Letter").  *See* Shields Dec. ¶ 26, Ex. 14.

## IV.    LENDER INITIATES STATE COURT LITIGATION AND THE UCC AUCTION

23.     On December 21, 2023, Lender filed a *Verified Complaint* (the "Complaint") in the Supreme Court of the State of New York, County of New York (Index No. 656413/2023) against JTRE 14 Vesey for breach of contract (the "State Court Litigation").  *See* Shields Dec. ¶ 28, Ex. 15.

24.     On January 4, 2024, Lender filed its *Application to Appoint a Receiver and Memorandum of Law in Support* (the "Motion to Appoint a Receiver").  *See* Shields Dec. ¶ 30.

25.     Contemporaneously, Lender engaged Keen-Summit Capital Partners, LLC ("Keen") to, among other things, conduct an auction under Section 9-610 of the Uniform Commercial Code on February 28, 2024, at 9:30 a.m. (ET) (the "UCC Auction") of the Lender's collateral interest in the Limited Liability Company interests of JTRE 14 Vesey.  *See* Shields Dec. ¶ 31, Ex. 16.

26.     On January 31, 2024, the Supreme Court of the State of New York, County of New York issued an *Order to Show Cause* which, among other things, directed JTRE 14 Vesey to show cause on March 1, 2024, why the Motion to Appoint a Receiver should not be granted.  *See* Shields Dec. ¶ 33, Ex. 17.

27.     On February 23, 2024, the bid deadline for third party bids related to the UCC Auction passed with no bidders making the minimum bid of $20,000,000, meaning that Lender,

with its planned credit bid of $20 million, would be the successful bidder at the UCC Auction.  *See* Shields Dec. ¶ 35.

28.    On February 26, 2024, Vesey Partners filed a complaint in the Supreme Court of the State of New York, County of New York identified by index no. 650937/2024 against Lender (the "Vesey Complaint") which sought, among other things, a preliminary and permanent injunction and temporary restraining order enjoining Lender from conducting the UCC Auction. *See* Shields Dec. ¶ 36, Ex. 18.  On February 27, 2024, the Supreme Court of the State of New York, County of New York denied Vesey Partners' order to show cause seeking a temporary restraining order and injunction and, among other things, noted that "it is unclear why [Vesey Partners] waited until two days before the sale when it has known the collateral would be sold since the middle of January."  *See* Shields Dec. ¶ 38, Ex. 19.

29.    Less than fifteen minutes before the UCC Auction was to occur, the Debtors filed these bankruptcy cases.  *See* Shields Dec. ¶ 40.

30.    The Debtors' filing was not accompanied by any first-day declarations, first-day motions, list of creditors, or schedules.  The Debtors have not filed any motions seeking operational relief.  Indeed, it is unclear what, if anything, the Debtors intend to accomplish in these cases other than obtain the benefit of the automatic stay.

31.    As of the Petition Date, the Lender was owed not less than $29,016,757.66.  *See* Shields Dec. ¶ 41.

32.    No agreement regarding adequate protection has been reached between Lender and the Debtors.

**RELIEF REQUESTED**

33.     Lender seeks entry of an order pursuant to sections 1112(b) and 305(a) of the Bankruptcy Code dismissing the Debtors chapter 11 cases for cause and with prejudice pursuant to section 349(a) of the Bankruptcy Code.

34.     In addition, and in the alternative, Lender seeks entry of an order granting relief from the automatic stay pursuant to sections 362(d)(1) and (d)(2) of the Bankruptcy Code allowing (i) the Lender to complete the UCC Auction, and (ii) continue the State Court Litigation, if the Lender believes further relief from the Supreme Court of New York is necessary.

**BASIS FOR THE RELIEF REQUESTED**

**I.     THESE CASES SHOULD BE DISMISSED WITH PREJUDICE FOR "CAUSE" PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**

35.     These cases should be dismissed with prejudice for cause because the Debtors filed their petitions in bad faith (indeed, a mere twelve minutes before the scheduled UCC Auction) and have no reasonable prospect of reorganization.

36.     Section 1112(b) of the Bankruptcy Code, provides, in pertinent part, that:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).  A request for dismissal under section 1112(b) must be scheduled by the Court no later than 30 days after filing of the motion and must be decided by the Court no later than 15 days after commencement of the hearing, unless the movant expressly consents to a continuance for a specific period of time or "compelling circumstances" prevent the Court from meeting the time limits.  11 U.S.C. § 1112(b)(3).

37.      "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith and the burden is on the bankruptcy petitioner to establish good faith." *15375 Mem'l Corp. v. BEPCO, LP* (*In re 15375 Mem'l Corp.*), 589 F.3d 605, 618 (3d Cir. 2009) (quotations omitted).  Although the phrase "good faith" suggests an inquiry into the debtor's subjective intent in filing a bankruptcy petition, the Third Circuit has firmly held that the "good faith" filing requirement is "based more on objective analysis of whether the debtor has sought to step outside the 'equitable limitations' of Chapter 11 than the subjective intent of the debtor." *Id.* at 618 n.8; *see also Official Comm. of Unsecured Creditors v. Nucor Corp.* (*In re SGL Carbon Corp.*), 200 F.3d 154, 165 (3d Cir. 1999).  In assessing a debtor's good faith, the bankruptcy court must consider "the totality of facts and circumstances" to determine where the bankruptcy petition falls "along the spectrum ranging from the clearly acceptable to the patently abusive." *Id.* at 162.

32.      The Third Circuit has identified two essential elements for a "good faith" bankruptcy filing.  First, the bankruptcy petition must "serve[] a valid bankruptcy purpose." *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc.* (*In re Integrated Telecom Express, Inc.*), 384 F.3d 108, 120 (3d Cir. 2004).  Second, the bankruptcy cannot be filed "merely to obtain tactical litigation advantage." *15375 Memorial*, 589 F.3d at 625 (citation omitted).

33.      Moreover, in determining whether a filing was made in bad faith, courts in the Third Circuit have also considered whether the following factors are present: (a) a single asset case; (b) few unsecured creditors; (c) no ongoing business or employees; (d) petition filed on eve of foreclosure; (e) two-party dispute that can be resolved in pending state court action; (f) no cash or income; (g) no pressure from non-moving creditors; (h) previous bankruptcy petitions; (i) prepetition conduct was improper; (j) no possibility of reorganization; (k) debtor formed

immediately prepetition; (l) the debtor filed solely to create automatic stay; and (m) the subjective

intent of the debtor.  *See In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 298-99 (Bankr.

D. Del. 2011) (quoting *In re Primestone Investment Partners L.P.*, 272 B.R. 554, 557 (D. Del.

2002)); *see also In re Mondelli*, 2013 WL 1187098, at *4 (D.N.J. Mar. 21, 2013), *aff'd*, 558 F.

App'x 260 (3d Cir. 2014) ("In determining whether a bankruptcy filing was made in bad faith, the

bankruptcy court looks to the totality of the circumstances, and may consider a wide range of

factors ….'") (citation omitted).

38.    The District of New Jersey has similarly articulated the following factors in

determining whether the bankruptcy filing was in bad faith:

(i)     The debtor has only one asset in which it does not hold legal title;

(ii)    The debtor has few unsecured creditors whose claims are small in relation
to the claims of the secured creditors;

(iii)   The debtor has few employees;

(iv)    The property is the subject of a foreclosure action as a result of arrearages
on the debt;

(v)     The debtor's financial problems involve essentially a dispute between the
Debtor and the secured creditors which can be resolved in the non-
bankruptcy forum; and

(vi)    The timing of the debtor's filing evidences an intent to delay or frustrate the
legitimate efforts of the debtor's secured creditor to enforce their rights.

*In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 802 (D.N.J. 1997).  As that court explained, "[t]he more

objectively clear it is that the debtor cannot reorganize, it is concomitantly more difficult to

conclude that the debtor's subjective belief in its ability to reorganize is in good faith." *Id.* (citing

*In re Roxy Real Estate Co., Inc.*, 170 B.R. 571, 573 (Bankr. E.D. Pa. 1993)); *see also In re*

*Mondelli*, 2013 WL 1187098, at *4 ("Importantly, the suspicious timing of a bankruptcy petition

is an appropriate factor for a court to consider in this bad faith analysis.").

39.     For the reasons set forth below, these factors are met here, and the cases should be dismissed.

**A.     The Debtors' Cases Serve No Valid Bankruptcy Purpose**

40.     The Debtors did not file for bankruptcy protection to preserve an ongoing business or to restructure, but rather to continue their frivolous and dilatory campaign to prevent Lender from exercising its remedies.  Contrary to the Debtors' bad faith efforts, the only proper purposes of chapter 11 are "preserving going concerns," and "maximizing property available to satisfy creditors."  *Integrated Telecom*, 384 F.3d at 119 (citation omitted).  Liquidation and distribution of the debtor's estate to stakeholders are not, standing alone, valid bankruptcy purposes justifying a debtor's choice to seek chapter 11 relief.  *Id.* at 126.  Instead, "[w]here there is no going concern to preserve," the debtor must affirmatively prove that a chapter 11 liquidation would "maximize value," *United States Tr. v. Stone Fox Capital LLC* (*In re Stone Fox Capital LLC*), 572 B.R. 582, 590 (Bankr. W.D. Pa. 2017) (citing *15375 Memorial*, 589 F.3d at 619), which means that "the … process contemplated in the bankruptcy case must be designed to realize some value that would not be available outside of bankruptcy." *Jameson*, 461 B.R. at 303.

41.     Here, it is beyond dispute that the Debtors are not a "going concern" capable of reorganization.  Their only meaningful asset is the Mortgaged Property. The Mortgaged Property is currently unoccupied.  It has no tenants and was undergoing renovations before such efforts were abandoned by the Debtors.  *See* Shields Dec., ¶ 24; *see also 15375 Memorial*, 589 F.3d at 619 (no "going concern" where debtor had "no employees, offices or business other than the handling of litigation…").  The Mortgaged Property has also had asbestos remediation performed and, upon information and belief, no replacement insulation was installed, such that the Mortgaged Property was not prepared for freezing temperatures.  Shields Dec., ¶ 23.  Moreover, the Debtors

have abandoned the Mortgaged Property and, therefore, are no longer actively managing or protecting their only asset and the Lender's collateral. *Id*. at ¶ 25; Ex. 13. Thus, the Debtors cannot establish a valid bankruptcy purpose in the form of "preserving a going concern", and instead the Debtors must show the chapter 11 case will maximize the value of the Debtors' estates, and that such value would be lost outside of bankruptcy. *15375 Memorial*, 589 F.3d at 619. The Debtors cannot make such a showing.

42.     Indeed, the court in *Y.J. Sons* found that the debtors had filed the petition in bad faith where they were no longer operating, or in possession of, their single, real property asset. *See* 212 B.R. at 802-03. The Debtors here similarly are not operating or actively in possession of the Mortgaged Property. Worse, in light of the Debtors' abandonment of the Mortgaged Property, Lender faces ongoing and significant risk of material diminution of the value of its collateral, the Mortgaged Property. That diminution is only exacerbated by this bad faith filing, which continues Debtors' efforts to prevent Lender from taking possession of and preserving the value of the Mortgaged Property.

43.     Rather, the Debtors' purpose in seeking chapter 11 relief here advances a singular and improper goal: to obtain the benefit of the automatic stay and halt the UCC Auction and State Court Litigation in favor of an alternative process of liquidating and distributing the Debtors' assets, which the Debtors perceive will be more favorable to their principal, Mr. Terzi. But the Third Circuit has held consistently that a debtor's bald desire to obtain the protections of the automatic stay is not a valid justification for seeking bankruptcy relief and has upheld the dismissal of cases under factual circumstances similar to those presented by this case. *See, e.g.*, *15375 Memorial*, 589 F.3d at 620; *Integrated Telecom*, 384 F.3d at 128; *see also Stone Fox*, 572 B.R. at

591 ("Filing a bankruptcy case to obtain the protection of the automatic stay is not a valid purpose; rather the stay is a benefit of a good faith filing.").

44.     The Debtors attempted to invoke the automatic stay twelve minutes before the UCC Auction solely to thwart the sale of the issued and outstanding equity in JTRE 14 Vesey that was pledged by Vesey Partners to Lender.  The Debtors also filed these cases less than two days before the hearing on Lender's motion to appoint a receiver in the State Court Litigation, less than one day after Vesey Partners' request for a temporary restraining order and injunction was denied, *and* one day *after* JTRE 14 Vesey had filed a motion to dismiss the State Court Litigation.  The chapter 11 cases are thus not commenced in good faith and should be dismissed under section 1112(b) of the Bankruptcy Code.

45.     Additionally, the Debtors have no source of cash or income because the Mortgaged Property is unoccupied and has no tenants and the value of the Mortgaged Property faces the risk of material diminution if the Debtors are allowed to continue to stymie Lender's efforts to preserve the Mortgaged Property, further weighing in favor of a finding of bad faith.  *See Jameson*, 461 B.R. at 298-99.

**B.     The Debtors' Cases Were Commenced Primarily to Obtain a Tactical Litigation Advantage**

46.     A chapter 11 case is also subject to dismissal if it was commenced primarily to obtain a tactical litigation advantage.  *See 15375 Memorial*, 589 F.3d at 605; *SGL Carbon*, 200 F.3d at 165; *In re GVS Portfolio I B, LLC*, 2021 WL 2285285, at *9 (Bankr. D. Del. June 4, 2021) (dismissing bankruptcy proceeding filed in bad faith and holding that "the fact that this case was filed immediately before foreclosure in order to obtain the automatic stay coupled with the two-party nature of the dispute between the Debtor and [the secured creditor], supports the finding that this case was filed by the Debtor for a tactical advantage against [the secured creditor] in the …

state court litigation that resulted in a foreclosure sale."); *In re Rent-A-Wreck of Am., Inc.*, 580 B.R. 364, 387 (Bankr. D. Del. 2018) (dismissing chapter 11 petition as bad faith filing where primary purpose was to circumvent unfavorable ruling in prepetition litigation against primary creditor).

47.     The tactical advantages gained by the Debtors in commencing these cases are evident.  Similar to *Jameson* and *GVS Portfolio*, the Debtors' chapter 11 petitions automatically stayed the pending UCC Auction **less than fifteen minutes** before it was set to begin and without any showing whatsoever by the Debtors.  It also stayed the State Court Litigation and thus, to date, prevented the appointment of a receiver for the Mortgaged Property, leaving the Mortgaged Property to continue to sit unoccupied and unmaintained.  Moreover, the bankruptcy filing also saddled Lender with the burden of coming forward to affirmatively seek relief from the Debtors' abusive filings.  In light of the foregoing, this Court should dismiss the Debtors' chapter 11 cases because the Debtors' filings were impermissible and were "clearly just a litigation tactic designed to forestall [Lender's] efforts to foreclose on its collateral . . . .".  *See Jameson*, 461 B.R. at 300.

## C.     Additional Indicia of Bad Faith Are Present Here

48.     The Court should also dismiss the Debtors' chapter 11 cases because they involve an overwhelming majority of the additional factors courts consider in determining whether a bankruptcy petition was filed in bad faith.  In fact, as discussed below, each and every factor enumerated by the *Y.J. Sons* court is present here.

### 1.     The Debtors Have Only One Asset

49.     As previously noted, the sole asset of JTRE 14 Vesey is the Mortgaged Property, and the sole asset of Vesey Partners is the issued and outstanding equity in JTRE 14 Vesey.  Although "there is nothing inherently improper in a single asset debtor filing" for chapter 11

bankruptcy, *Primestone Inv. Partners*, 272 B.R. at 558, courts have uniformly held that this factor

weighs against a finding of good faith on the part of the debtor. *See, e.g.*, *Jameson*, 461 B.R. at

299 (chapter 11 filing by junior mezzanine lender was in bad faith where, among other things,

"Mezz II ha[d] only one asset (the membership interest in Mezz I)"); *Primestone Inv. Partners*,

272 B.R. at 558 (same); *see also SGL Carbon*, 200 F.3d at 165 (same); *In re Y.J. Sons & Co., Inc.*,

212 B.R. at 804 (D.N.J. 1997) (affirming dismissal of bankruptcy case as bad faith filing where

debtor's purpose was to sell its sole asset "on better terms than those given by the Superior Court").

### 2.    The Debtors Have Few, if any, Unsecured Creditors

50.    The Debtors list no unsecured creditors on their petitions.

51.    Lender is aware that the Debtors have failed to timely pay contractors and other

service providers with respect to services performed at the Mortgaged Property.  Such failures

have resulted in several mechanic's liens being recorded on the Mortgaged Property: (i) on

February 1, 2023, James Harb Architect P.C. recorded a mechanic's lien for unpaid charges

totaling $42,878.17; (ii) on April 6, 2023, New York Insulation Inc. recorded a mechanic's lien

for unpaid charges totaling $47,147.30; and (iii) on September 8, 2023, Nouveau Elevator

Industries LLC recorded a mechanic's lien for charges totaling $31,306.48.  Shields Dec. ¶ 21.

These claims pale in comparison to Lender's approximately $28 million claim.

52.    Courts have recognized that the lack of an unsecured claims pool weighs in favor

of a finding of bad faith. *See, e.g.*, *In re EFL Partners X*, 2013 WL 4508423, at *5 (Bankr. E.D.

Pa. Aug. 23, 2013) (holding debtor did not file petition in good faith and finding that of debtor's

four unsecured creditors, one was an insider and two were professionals); *St. Paul Self Storage

Ltd. P'ship v. Port Auth.* (*In re St. Paul Self Storage Ltd. P'ship*), 185 B.R. 580, 583 (B.A.P. 9th

Cir. 1995) (the debtor's "lack of creditors, other than insiders and its own professionals, further

Case 24-12087-MBK    Doc 16    Filed 03/08/24    Entered 03/08/24 15:14:09    Desc Main
Document      Page 19 of 26

indicated . . . that protection under the Bankruptcy Code was not necessary to a . . . legitimate reorganization").

53.     Further, there is no indication that any unsecured creditors, even assuming they have valid claims, have been exerting pressure on or commenced collection efforts against the Debtors prior to the bankruptcy filing, except for the mechanic's liens listed above.  *See Jameson*, 461 B.R. at 299 (the debtor's creditors, "if they [even] are creditors, were exerting no pressure on [the debtor] before the filing").

### 3.    The Debtors Have Few, if any, Employees

54.     Lender does not believe that Debtors have any employees.  Nor would the Debtors have need of any employees because they have no ongoing business, and the Mortgaged Property is unoccupied, unmaintained, and non-operational.  Shields Dec. ¶¶ 25-26.

### 4.    The Mortgaged Property Is the Subject of State Court Litigation as a Result of Arrearages on the Debt

55.     As discussed above, the Mortgaged Property is the subject of State Court Litigation in which, among other things, Lender is seeking to appoint a receiver to manage the Mortgaged Property.  Shields Dec. ¶ 30.

56.     Additionally, because of the arrearages on the debt, Lender sought to conduct the UCC Auction, which was stayed due to the Debtors filing these cases. And, as discussed below, there is nothing that can be accomplished in this Court that could not be accomplished in the already pending State Court Litigation.

### 5.    The Debtors' Financial Problems Are, At Bottom, a Two-Party Dispute Between the Debtors and Lender Which Can Be Resolved in State Court

57.     The Debtors' bankruptcy proceedings are really a two-party dispute that has already been ongoing as evidenced by the State Court Litigation and the UCC Auction.  *See* Shields Dec. ¶¶ 28-38, Exs. 14-18.

58.     Courts generally hold in these circumstances that such a dispute does not belong in bankruptcy court.  *See, e.g.*, *In re GVS Portfolio I B, LLC*, 2021 WL 2285285, at *9 (holding that "this is certainly a dispute between the Debtor and [its secured creditor]," and "nothing that need happen in this Court that cannot happen in state court"); *In re Scarborough-St. James Corp.*, 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (dismissing a "two-party dispute" between debtor and its landlord relating to entitlement to rents from debtor's sole material real estate asset); *Jameson*, 461 B.R. at 299 (dismissing case where Court found it "involve[d] only a two-party dispute" between two competing lenders); *In re SB Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) (dismissing debtor's petition where filing was "no more than a thinly veiled litigation tactic in a two party . . . dispute."); *In re Asanda Air II LLC*, 600 B.R. 714, 722 (Bankr. N.D. Ga. 2019) ("[T]his reorganization essentially involves the resolution of a two-party dispute . . . as the Debtor's 'financial problems' stem solely from [a] [s]tate [c]ourt [p]roceeding and the underlying contract dispute [with the debtor's sole major creditor]").

> **6.      The Timing of the Debtors' Filings—Less than Fifteen Minutes Before the Scheduled UCC Auction—Evidences an Intent to Delay or Frustrate the Legitimate Efforts of the Debtors' Secured Creditor, Lender, to Enforce Its Rights**

59.     The Debtors filed their cases mere *minutes* before the scheduled UCC Auction, less than one day after Vesey Partners' request for a temporary restraining order and injunction was denied, and two days before the hearing on the Lender's motion to appoint a receiver in the State Corut Litigation.  Courts have repeatedly held under similar circumstances that such timing is highly suggestive of bad faith.  *See, e.g.*, *In re Mondelli*, 2013 WL 1187098, at *4 (affirming

bankruptcy court's dismissal of bad faith filing where petition was filed on the morning of the twice-adjourned sheriff's sale and based on the bankruptcy court's finding that "[i]t couldn't be more obvious [that the] debtor's motive in filing the [March 14 Petition] was to stay the [Sheriff's] sale. Again."); *Jameson*, 461 B.R. at 299-300; *Stone Fox Capital*, 572 B.R. at 586 (filing was in bad faith where bankruptcy proceeding commenced four days before sheriff's sale of collateral); *cf. SureFunding*, 2020 WL 8834902, at *5 (finding bad faith where, "[a]lthough not filed on the eve of a foreclosure, the petition was filed merely a day after [a] receivership order was entered[]" against the debtor and its property); *In re SB Properties, Inc.*, 185 B.R. at 205 (dismissing petition where debtor filed for bankruptcy immediately prior to state court appraisal of debtor's sole asset in connection with court-ordered sale) *GVS Portfolio*, 2021 WL 2285285, at *9 ("[T]he fact that this case was filed immediately before foreclosure in order to obtain the automatic stay… supports the finding that this case was filed by the Debtor for a tactical advantage[.]").

60.     The fact that the Debtors filed their petitions mere minutes before the UCC Auction – and that they have filed no affidavit, declaration, or other evidentiary support for their purported intent – can lead to only one conclusion: the Debtors' sole purpose was to obtain and abuse the automatic stay.  This factor weighs strongly in favor of a finding of bad faith.

**D.     The Chapter 11 Cases Should Be Dismissed with Prejudice Pursuant to Sections 105(a) and 349(a) of the Bankruptcy Code**

61.     Section 349(a) of the Bankruptcy Code provides in relevant part that "[u]nless the court, for cause, orders otherwise, the dismissal of a case under this title does not . . . prejudice the debtor with regard to the filing of a subsequent petition under this title …."  11 U.S.C. § 349(a).  Pursuant to section 105(a) of the Bankruptcy Code, the Court may "tak[e] any action or mak[e] any determination necessary or appropriate to enforce or implement court orders or rules, ***or to prevent an abuse of process***." 11 U.S.C. § 105(a) (emphasis added).

21

62.     A bankruptcy court may apply its inherent powers under sections 105(a) and 349(a) to dismiss a debtor's chapter 11 case with prejudice and prohibit subsequent filings where the debtor commenced its bankruptcy case for an improper purpose and in bad faith.  *See Jameson*, 461 B.R. at 304 (dismissing case with prejudice due to bad faith filing).  Dismissal with prejudice is also appropriate where necessary to prevent the debtor from obtaining an unfair advantage in ongoing disputes outside of the bankruptcy court.  *See, e.g.*, *Scarborough-St. James Corp.*, 2015 WL 5672628, at *3 ("Court [] prohibit[ed] Debtor from filing another bankruptcy petition for a period of four months" to allow debtor's landlord to obtain relief in pending state court proceeding); *In re Riverbend Cmty., LLC*, 2012 WL 1030340, at *4-5 (Bankr. D. Del. Mar. 23, 2012) (dismissing case with prejudice and enjoining subsequent petition until after foreclosure sale occurred); *see also In re Class A Props. Five, LLC*, 600 B.R. 27, 38-39 (Bankr. N.D. Ill. 2019) (dismissal of prior bad faith bankruptcy with prejudice barred debtor from filing subsequent bankruptcy).

63.     Here, it is necessary for the Court to dismiss the Debtors' cases with prejudice to prevent the Debtors from attempting to file a successive petition in this or another jurisdiction to further forestall the appointment of a receiver in the State Court Litigation, delay the UCC Auction, and otherwise frustrate Lender's rights with respect to Mortgaged Property.  As a consequence of the Debtors' bad faith filing, Lender has suffered significant setbacks in completing the appointment of a receiver in the State Court Litigation, which leaves the Mortgaged Property without management, and has incurred significant enforcement costs, and faces the risk of material diminution of the value of its collateral as a result of further delay.  Accordingly, Lender respectfully submits that the Court should order the dismissal of the Debtors' chapter 11 cases with

prejudice and prospectively enjoin any further filings by the Debtors to prevent any further harm

to the Lender.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD TERMINATE THE AUTOMATIC STAY

### A.    The Debtors Bankruptcy Filing Constitutes a Filing in Bad Faith that is Cause for Stay Relief

64.    Section 362(d)(1) of the Bankruptcy Code provides that the bankruptcy court

"shall" grant relief from the automatic stay on request of a party in interest "for cause, including

the lack of adequate protection of an interest in property of such party in interest . . . ." 11 U.S.C.

§ 362(d)(l).  If the movant makes a prima facie case for "cause" for relief, the burden of going

forward shifts to the debtor pursuant to section 362(g) of the Bankruptcy Code.  *See Izzarelli v.*

*Rexene Prods. Co.* (*In re Rexene Prods. Co.*), 141 B.R. 574, 576 (Bankr. D. Del. 1992).  The

burden of proof on the issue of whether a secured creditor's interest in property is adequately

protected, however, belongs at all times to the debtor. *See* 11 U.S.C. § 362(g)(2); *Wilmington Savs.*

*Fund Soc. v. 1025 Assocs., Inc.* (*In re 1025 Assocs., Inc.*), 106 B.R. 805, 810 (Bankr. D. Del. 1989).

65.    In addition, under section 362(d)(2) of the Bankruptcy Code, the stay of an act

against property must be lifted if "the debtor does not have an equity in such property" and "such

property is not necessary for an effective reorganization." 11 U.S.C. § 362(d)(2).  The movant

requesting relief from the stay under section 362(d)(2) bears the burden of proof as to the debtor's

equity in the property, at which point the burden shifts to the debtor to prove the feasibility of

reorganization.  *See* 11 U.S.C. § 362(g); *1025 Assocs.*, 106 B.R. at 810.

66.    "Filing bankruptcy in bad faith is 'cause' for relief under [] section 362(d)(1)."

*Mother African Union Methodist Church v. Conference of AUFCMP Church* (*In re Conference of*

*African Union First Colored Methodist Protestant Church*), 184 B.R. 207, 218 (Bankr. D. Del.

1995); *see In re Lippolis*, 228 B.R. 106, 112 (E.D. Pa. 1998) (stay relief granted based upon

debtor's bad faith filing); *In re Merchant*, 256 B.R. 572, 576-77 (Bankr. W.D. Pa. 2000) (finding

bad faith filing can constitute "cause" for relief from the stay, noting it is an "abuse of § 362 . . .

when a debtor has no intention of effectuating a realistic plan of reorganization.").

67.     As demonstrated above, the Debtors filed their bankruptcy petitions in bad faith.

Lender is the Debtors' primary creditor and the fulcrum security, and the only assets of the Debtors

are the Mortgaged Property and the equity in JTRE 14 Vesey, both of which are Lender's

collateral.  The Debtors commenced these cases less than fifteen minutes before the Auction to

dispose of the equity in JTRE 14 Vesey.  The Debtors have no operating business, no employees,

no bondholders, and no material unsecured creditors.  The Debtors' bankruptcy filings are bare

bones, with no support for how they intend to reorganize.  In short, the Debtors' bankruptcy filings

accomplish little more than to frustrate the exercise of legitimate, bargained-for rights by the

Debtors' secured creditor.  Moreover, Lender faces ongoing and significant risk of material

diminution of the value of its collateral.  Accordingly, Lender respectfully submits that cause exists

to lift the automatic stay to permit Lender to proceed with a foreclosure sale of its collateral, the

Mortgaged Property, in accordance with state law.

**B.     There is Also Cause to Lift the Stay Because Lender Lacks Adequate Protection**

68.     The automatic stay should also be lifted because Lender's interest in the Mortgaged

Property is not adequately protected.  11 U.S.C. § 362(d)(1).  In determining whether an interest

in property is adequately protected, courts engage in an analysis of the property's "equity cushion,"

which is the value of the property after deducting the claim of the creditor seeking relief from the

automatic stay and the amount of any claims that have a senior interest in such property.  *Nantucket*

*Investors II v. Cal. Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 207 (3d Cir. 1995).  For

purposes of section 362(d)(1), adequate protection exists if there is an equity cushion and (a) such

cushion is sufficient to absorb the continued interest accrual, or (b) the debtor is servicing the debt. *Indian Palms*, 106 B.R. at 210; *see also* 3 COLLIERS ON BANKR. P 361.03 (16th ed. 2021) ("existence of a small equity cushion does not assure protection; the cushion must be sufficiently substantial to assure that the decline in value will not affect the secured claim."). Otherwise, the movant's interest is not adequately protected and grounds for relief from the stay exist. *Id.* Here, Lender's interest in the Mortgaged Property is not adequately protected, making stay relief appropriate.

69.    The Debtors have not alleged that there is any "equity cushion" in the Mortgaged Property to protect Lender's interest. Indeed, they cannot because the Mortgaged Property is significantly underwater by millions of dollars. Vesey Partners admitted the appraisal value of the Mortgaged Property is just $18.7 million and Lender's payoff totals over $29 million. Shields Dec. ¶¶ 36-37, 40, Ex. 18 ¶ 59. And because the Debtors have not provided or offered any alternative form of adequate protection to Lender from the immediate deterioration of its collateral's value caused by the imposition of the automatic stay, Lender is entitled to relief from the stay under Bankruptcy Code section 362(d)(1).

### III.    WAIVER OF THE FOURTEEN-DAY STAY UNDER BANKRUPTCY RULE 4001(a)(3) IS WARRANTED

70.    Courts may waive the fourteen-day stay under Bankruptcy Rule 4001(a)(3) based upon the totality of the circumstances and as an equitable remedy. *See In re Eclair Bakery Ltd.*, 255 B.R. 121, 143 n.42 (Bankr. S.D.N.Y. 2000) (stay under Rule 4001(a)(3) waived due to debtor's unclean hands); *In re Soltzfus*, 2009 WL 2872860, at *7 (Bankr. E.D. Pa. Mar. 30, 2009) (stay under Rule 4001(a)(3) waived due to debtor's improper filing of bankruptcy case).

71.    Here, the Debtors' bad faith filing of their chapter 11 cases, where Debtors clearly lack any ability to effectively reorganize, combined with the risk to the value of Lender's collateral

as discussed above, all warrant a waiver of the fourteen-day stay.  Accordingly, Lender respectfully requests that the Court waive the fourteen-day stay period under Bankruptcy Rule 4001(a)(3).

WHEREFORE, the Lender therefore respectfully requests that the Court enter an order (i) substantially in the form attached hereto as Exhibit 1, dismissing the chapter 11 cases with prejudice; or (ii), in the alternative, granting Lender relief from the automatic stay to conduct the Auction and continue the State Court Litigation; and (iii) granting such other and further relief that is just and proper under the circumstances.

Date: March 8, 2024                           */s/ Kevin M. Capuzzi*
                                              Kevin M. Capuzzi (NJ No. 173442015)