**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

*Caption in Compliance with D.N.J. LBR 9004-2*

**A.Y. STRAUSS LLC**
Eric H. Horn, Esq.
Maria A.G. Harper, Esq.
Heike M. Vogel, Esq.
290 West Mount Pleasant Avenue, Suite 3260
Livingston, New Jersey 07039
Tel. (973) 287-0966
Fax  (973) 533-0127

*Proposed Counsel to the Debtors
and Debtors in Possession*

| | |
|---|---|
| In re:<br><br>JTRE 14 VESEY LLC,<br><br>         Debtor. | Chapter 11<br><br>Case No. 24-12087 (MBK)<br><br>*(Joint Administration to be Requested)* |
| In re:<br><br>14 VESEY STREET PARTNERS (DEL) LLC,<br><br>         Debtor. | Chapter 11<br><br>Case No. 24-12086 (MBK) |

**DEBTORS' OBJECTION TO MOTION OF CPIF MRA, LLC
TO DISMISS THESE CHAPTER 11 CASES WITH PREJUDICE OR,
IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY**

JTRE 14 Vesey LLC (the "***JTRE Debtor***") and 14 Vesey Street Partners (Del) LLC (the

"***Partners Debtor***" and together with the JTRE Debtor, the "***Debtors***"), each a debtor and debtor

in possession herein, respectfully submits this Objection in opposition to the motion to dismiss

or, alternatively, for relief from the automatic stay filed by CPIF MRA, LLC (the "***Lender***" or

"***CPIF MRA***").   In support of this Objection, the Debtors rely on the Declaration of David

Goldwasser filed concurrently herewith and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these chapter 11 cases, on an emergent basis, less than one month

ago.  The Debtors did not intend on commencing these chapter 11 cases.  They did so only after

all efforts to work with the Lender failed.

2.      The Lender will have the Court believe that the Debtors' filing was done in bad

faith.  It asserts, without support, that the Debtors' chapter 11 cases are being used as a tactical

advantage in a two-party dispute litigation.  These chapter 11 cases are much more than a two-

party dispute.  Indeed, as seen in the JTRE Debtor's Schedules of Assets and Liabilities [Docket

No. 21], the JTRE Debtor has fourteen (14) unsecured creditors totaling more than $5 million.

3.      As demonstrated below, it is evident that a weighing of the applicable factors leads

to the conclusion that these chapter 11 cases were filed in good faith and should not be dismissed.

The totality of the facts and circumstances reveal that the Debtors' petitions serve the valid

bankruptcy purpose of running a fulsome sale process of the Property – in an effort to maximize

value for the benefit of all stakeholders, and that the cases were not filed merely to leverage some

tactical advantage.

4.      Additionally, the Lender contends that a chapter 11 petition filed in bad faith is

"cause" to grant relief from the automatic stay under § 362(d)(1).  As amply demonstrated below,

the Lender is completely off base.  Moreover, Lender purports that it is entitled to relief from the

automatic stay under § 362(d)(2) on account of an alleged lack of equity cushion (adequate

protection) and that the Property is not necessary for the JTRE Debtor to reorganize.  That

argument too fails.  Indeed, as demonstrated below, the Debtors believe that the $25 million

valuation of the Property is much higher than the undisputed portion of the amounts owing under the Loan Documents. Moreover, the Lender's argument regarding the Property not being necessary for an effective reorganization is simply wrong. In point of fact, the Property is the JTRE Debtor's main asset, without which there is no reorganization. For the Lender to argue anything to the contrary is disingenuous.

5.      At bottom, the Debtors believe that the Lender is adequately protected in these chapter 11 cases and will remain so during the duration of the sale process, which the JTRE Debtor anticipates commencing in short order. This sale process will certainly inure to the benefit of the Lender as the largest creditor of the JTRE Debtor and will certainly garner a higher and better value than a fire sale on the courthouse steps.

6.      Accordingly, the Lender has failed to establish the necessity of the relief requested and its motion should be denied.

**<u>BACKGROUND</u>**

7.      On February 28, 2024 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (the "***Chapter 11 Cases***") in this court.

8.      The Debtors continue to operate their businesses as a debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. No committee, trustee, or examiner has been appointed in this Chapter 11 Case.

**A.      <u>The JTRE Debtor</u>**

8.      14 Vesey Street Partners (DEL) LLC owns 100% of the membership interests of JTRE 14 Vesey LLC.

9.      The JTRE Debtor owns, in fee simple, the real property at located at 14 Vesey Street, New York, New York 10007 (the "***Property***").

**B.**      **The Partners Debtor**

10.      The ownership of 14 Vesey Street Partners (DEL) LLC is as follows:  (i) JTRE Holdings LLC owns 90% of the membership interests; and (ii) the remaining 10% of  the membership interests are owned by outside investors each of which own less than 6% of the membership interests.

**C.**      **The Property**

11.      The Property is a unique, historic building that was once owned by the New York County Lawyers Association, and is therefore known as the "New York County Lawyers Association Building."



12.      The Property was designed by a famous architect Cass Gilbert in 1930, and was designated as a "Landmark" by New York City in 1965.

13.      In designating the Property as a Landmark, the New York Landmark Preservation Commission noted:

> On the basis of a careful consideration of the history, the architecture and other features of this building, the Landmarks Preservation Commission finds that the New York County Lawyers Association Building has a special character, special historical and aesthetic interest and value as part of the development, heritage and cultural

characteristics of New York City.  The Commission further finds
that, among its important qualities, this distinguished building has
set a very high standard for the planning, design and construction of
a small clubhouse and that, as such, the New York County Lawyers
Association Building makes a significant contribution to the
architectural beauty of the City.

14.     As noted by one architect, the Property was declared the "Home of Law" when it

was constructed in 1930.

15.     The JTRE Debtor is finalizing its retention of a broker.  Such broker has opined

that based on a fully marketed sale process (as opposed to a fire sale), the value of the Property

could exceed $25 million.

**D.      Pre-Petition Debt**

**(i)      Secured Debt**

16.     The JTRE Debtor, at the direction of the Partners Debtor, purchased the Property

on or around April 22, 2021, financing part of the purchase price with a loan facility in an amount

of up to $18,050,000 from CPIF Lending LLC ("***CPIF Lending***"), a purported predecessor in

interest to Lender (the "***Acquisition Loan***").

17.     The Partners Debtor sought to make improvements to the Property and directed the

JTRE Debtor to enter into another loan agreement with CPIF Lending for an amount up to

$7,950,000 (the "***Building Loan***") to finance the costs of renovations, repairs, and other

improvements.

18.     The terms of the Building Loan and the Acquisition Loan (collectively, the

"***Loans***") are governed by two Loan Agreements corresponding to the Loans (collectively, the

"***Loan Agreements***").

19.     As a condition to making funds available to the JTRE Debtor under the Loans, CPIF Lending required the Partners Debtor to pledge the membership interests as security pursuant to two pledge agreements corresponding to the Loans.

20.     In connection with both the Acquisition Loan and Building Loan, the JTRE Debtor executed two promissory notes corresponding to the Loans (collectively, the "***Notes***").

21.     Under the original terms of the Notes, the Loans matured on April 22, 2022, but that date could be extended until October 22, 2022 provided, among other things, there were no ongoing "Events of Default".

22.     On or about May 19, 2021, CPIF Lending purported to assign to its interest in the Loan Agreements, Notes, Pledge Agreements, and various other agreements related to the Loans (collectively, the "***Loan Documents***").

23.     On November 16, 2022, the JTRE Debtor and the Lender entered into two "change-in terms" agreements corresponding to the Building Loan and Acquisition Loan (collectively, the "***Amendments***").  The Amendments, among other things, extended the maturity of the Loans to April 30, 2023.

24.     The Debtors believe the correct amount outstanding under the Loans to be less than $20 million.

**(ii)    Unsecured Debt**

23.     As of the Petition Date, the JTRE Debtor owes approximately $5,016,658 to fourteen (14) unsecured creditors.

**E.    Prepetition Litigation Commenced Against the Debtors**

24.     On December 21, 2023, Lender commenced an action in the New York Supreme Court, County of New York against the JTRE Debtor bearing Index Number 656413/202314. Subsequently, in that action, Lender sought to appoint a receiver.

25.     Additionally, Lender commenced a UCC-foreclosure process with respect to the membership interests of the JTRE Debtor.  The sale was to take place on February 28, 2024 (the "***Foreclosure Sale***").

**F.     Reasons for Filing of the Chapter 11 Cases**

26.     Following the purchase of the Property, the Partner's Debtor, through the JTRE Debtor, made repairs and renovations to the Property in an attempt to refurbish it and maximize its value.

27.     However, CPIF MRA and/or CPIF Lending substantially and inexcusably delayed their funding of the renovations under the Loan Agreements, which prevented the JTRE Debtor from completing its renovation of the Property.

28.     By letter to the JTRE Debtor dated November 7, 2023, CPIF MRA asserted that various "Events of Defaults" had occurred under the Loan Documents, including JTRE's alleged non-payment of the Notes upon maturity.

29.     On or about January 8, 2024, the Debtors received a marketing email from Keen-Summit Capital Partners LLC ("***Keen Summit***"), acting as CPIF MRA's broker, advertising the Foreclosure Sale.

30.     The Debtors understand that said email, and various subsequent emails they received from Keen Summit were CPIF MRA's  primary method of advertising the Foreclosure Sale to the public.  The Debtors did not receive formal notice of the sale until January 26, 2024.

31.     On February 26, 2024, the Partners Debtor filed a complaint by order to show cause with the New York Supreme Court, County of New York bearing Index Number 650937/2024, seeking to cancel the sale.  The court denied the relief sought by Partners Debtor on the same date.[1]

32.     Following such denial, the Debtors texted with the principal of CPIF MRA seeking to push out the foreclosure sale by one week, to which such said principal responded "sure."

33.     This agreement was later reneged and as a result, the Debtors commenced these Chapter 11 Cases.

**G.     The Chapter 11 Cases**

34.     The Debtors desperately tried to avoid the filing of these Chapter 11 Cases.  In fact, the Debtors understood that they were going to be given more time to explore whether an accord could be reached with the Lender – and that was memorialized in a text message.  Unfortunately, the Lender reneged, resulting in the emergency chapter 11 filings.

35.     Because of the emergent nature, the Debtors filed bare-bones petitions.

36.     Since the February 28, 2024 filings, the Debtors have filed all Schedules of Assets and Liabilities, the Statements of Financial Affairs, and a First Day Declaration.

37.     As reflected in the JTRE Debtor's Schedules of Assets and Liabilities, the JTRE Debtor owes approximately $5,016,658 to fourteen (14) unsecured creditors.

38.     In short order, the JTRE Debtor intends on retaining a broker to market the Property for sale and filing motion papers to establish bidding procedures for same.

---

[1] In its Complaint, the Partner's Debtor attached a broker opinion from June of 2023 which placed the value at approximately $19 million.  The JTRE Debtor's new broker that it will be seeking to retain places the value in excess of $25 million.

## ARGUMENT

I.    **THE COURT SHOULD DENY THE LENDER'S MOTION TO DISMISS
THE DEBTORS' CHAPTER 11 CASES PURSUANT TO § 1112(B)(1) OF
THE BANKRUPTCY CODE AS THE CHAPTER 11 CASES WERE FILED IN
GOOD FAITH.**

39.     Section 1112(b)(1) of the Bankruptcy Code provides that the court must convert a

chapter 11 case to a chapter 7 case or dismiss same,  "whichever is in the best interests of creditors

and the estate, for cause unless the court determines that the appointment under section 1104(a) of

a trustee or an examiner is in the best interests of creditors and the estate."  Section 1112(b)(4) sets

forth sixteen categories of events that could constitute "cause."

40.     Chapter 11 cases are also subject to dismissal for cause if filed in bad faith.  *In re

Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d Cir. 2004).  "Whether the good faith

requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the

totality of facts and circumstances' and determine where a 'petition falls along the spectrum

ranging from the clearly acceptable to the patently abusive.'"  *Id.* (quoting  *In re SGL Carbon

Corp.*, 200 F.3d 154 (3d Cir.1999)).  "[T]he existence of good faith depends on an amalgam of

factors and not upon a specific fact."  *In re Marsch*, 36 F.3d 825, 828 (9th Cir. 1994) (citation

omitted).

41.     In assessing whether a filing was in bad faith, courts consider "whether a debtor is

attempting to unreasonably deter and harass creditors or attempting to effect a speedy, efficient

reorganization on a feasible basis."  *Id; see also Matter of Newark Airport/Hotel Ltd. P'ship,* 156

B.R. 444, 448–49 (Bankr. D.N.J.), *aff'd*, 155 B.R. 93 (D.N.J. 1993) ("The true test of whether a

debtor has made a filing in 'bad faith' is whether there is some possibility of successful

reorganization without inordinate delay and whether the debtor entered the bankruptcy process

with any real intention to reorganize rather than for purposes of delay.").

42.     Two particularly relevant inquiries are "(1) whether the petition serves a valid bankruptcy purpose, *e.g.,* by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." *Integrated Telecom Express*, 384 F.3d at 120.

43.     To determine whether a Chapter 11 case has a valid bankruptcy purpose, courts consider the following factors:

> (i)     The Debtor has only one asset, the Property, in which it does not hold legal title;
> (ii)    The Debtor has few unsecured creditors whose claims are small in relation to the claims of the Secured Creditors;
> (iii)   The Debtor has few employees;
> (iv)    The Property is the subject of a foreclosure action as a result of arrearages on the debt;
> (v)     The Debtor's financial problems involve essentially a dispute between the Debtor and the secured creditors which can be resolved in the State Court Action; and
> (vi)    The timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditor to enforce their rights.

*In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 802 (D.N.J. 1997).

44.     The presence of some of the above factors in a particular case is not dispositive of bad faith.  *See In re EnCap Golf Holdings, LLC*, 2008 WL 4200324, at *8 (Bankr. D.N.J. Sept. 4, 2008).  Courts must examine the full context of the particular Chapter 11 filing to determine whether "a valid reorganizational purpose exists and that the petition was filed in good faith." *Id.*

45.     *EnCap Golf Holdings* is instructive.  There, the court found that some of the bad faith factors were met; specifically, that the debtor had only one asset, few employees, and was in arrears with its lender.  *See* 2008 WL 4200324, at *2; 8.  However, the court also found that the debtor's interest in the asset was not only subject to the lender's lien, but also to the New Jersey Meadowlands Commission's ("NJMC") reversionary interest.  *Id.* at *8.  Moreover, while

"NJMC's intention to declare [the debtor] in default of the Redevelopment Agreement was the precipitating cause for the Chapter 11[,]" the court observed that "courts have not found that a petition filed on the eve of creditor action constitutes a *per se* bad faith filing." *Id.*  The debtor also had unsecured claims which, while "numerically smaller" than the secured claims, were not insignificant.  *Id.*  Thus, the court concluded that the case was "not simply a two party dispute." *Id.*

46.     A similar conclusion is warranted here.  As of the petition date, the Debtor owes over $5 million to fourteen (14) unsecured creditors.  This is a substantial amount that cannot be categorized as "small in relation to the claims of the Secured Creditors," given that the unsecured claims in the aggregate reflect approximately twenty percent (if not more) of overall creditor claims.  *See Y.J. Sons & Co.,* 212 B.R. at 802.

47.     An examination of the full context of these Chapter 11 Cases reveal that the "petition serves a valid bankruptcy purpose" by preserving a going concern, *i.e.*, the Property, and that the petition was not filed for the improper purpose of securing a "a tactical litigation advantage."  *Integrated Telecom Express*, 384 F.3d at 120.  To the contrary, the Debtors seeks to facilitate a sale process which will only inure to the benefit of the Lender.  Accordingly, this Chapter 11 Case was filed in good faith and should not be dismissed.

48.     The Debtor does not dispute that certain factors set forth in *Y.J. Sons & Co.* are present here.  The Debtor's only asset is the Property, which is encumbered by the Lender's mortgages. The Property is also the subject of a UCC-foreclosure process commenced by the Lender.  The Debtors do not currently have employees.  However, whether weighed in isolation or cumulatively, these factors do not warrant a bad faith finding for multiple reasons.

49.     First, Section 101(51B) of the Bankruptcy Code empowers the reorganization of single asset real estate ("**SARE**") entities (such as the JTRE Debtor) and has done so since 1994 when Congress enacted the Bankruptcy Reform Act of 1994. In 2005 Congress revisited SARE cases in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, by revising the definition of SARE and amending the Bankruptcy Code with respect to how these cases are administered. Congress has thus had ample opportunity to bar SARE debtors from seeking relief under the Bankruptcy Code, but it has tellingly not done so. By making reorganization of SARE entities available, Congress intended that debtors avail themselves of the relief provided by the Bankruptcy Code. Therefore, the fact that the JTRE Debtor involves a SARE does not support a finding of bad faith.

50.     Likewise, the fact that the Debtors do not have employees is not material here. From the outset, the Debtors did not have employees and their principals have been leading the charge here. Additionally, prior to the commencement of these Chapter 11 Cases, the Debtors brought in David Goldwasser to serve as the vice-president of restructuring. Mr. Goldwasser is an experienced chapter 11 real estate operator with a track record of results. Under his stewardship, the Debtors are hopeful that they could sell the Property at the highest and best value while at the same time reaching an accord with the Lender. At a minimum, the Debtors should be given the opportunity to accomplish same – particularly when the Lender is going to be the largest beneficiary of any sale proceeds.

51.     As the court stated in *EnCap Golf Holdings*, "[i]n the context of this case the real question is not how many persons are employed by [the debtor], but what are they doing?" 2008 WL 4200324, at *8 (finding fact that the debtor had few employees insignificant, as the debtor "never had many employees," the relevant work was performed by contractors, and the debtor's

post-petition conduct "demonstrates that its officers are meeting their obligations to negotiate with [the debtor's] creditors and to formulate a plan of reorganization"). The same is true here.

52.     Additionally, the fact that the Property is the subject of a non-judicial UCC-foreclosure action is not dispositive. Here, the Lender ignores the Debtors' intent to fully market the Property for sale in an effort to receive the highest and best value – for the benefit of the Lender. The existence of a non-judicial foreclosure process does not in any way dictate a bad faith finding.

53.     The fifth factor under *Y.J. Sons & Co.*, referenced above, that "[t]he Debtor's financial problems involve essentially a dispute between the Debtor and the secured creditors which can be resolved in the State Court Action," is not present here. The Debtor's financial problems here involve more than the Lender. There are presently fourteen unsecured creditors with interests at stake, making resolution before state courts impractical.

54.     The sixth factor under *In re Y.J. Sons & Co.,* that "[t]he timing of the Debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the Debtor's secured creditor to enforce their rights[,]" does not weigh in favor of a bad faith finding here. Following the Lender's filing of the State Court Action on December 21, 2023 and the non-judicial UCC-foreclosure process, the Debtors attempted to work in good faith to resolve the issues raised in same. The timing of the filing while on the same day as the non-judicial UCC-foreclosure sale is of the Lender's doing. Indeed, as noted above, the Lender confirmed by text that the Debtors would be given more time to work out the issues – only to renege on the same day of the chapter 11 filings. Thus, the temporal proximity between the Petition Date and the UCC membership foreclosure sale is not relevant to this inquiry. Notwithstanding, these Chapter 11 Cases were not filed for the frivolous purpose of delaying or frustrating any of the Debtors' creditors' efforts to enforce their rights. Rather, these Chapter 11 filings provide the parties the forum to resolve all outstanding

claims in an expeditious manner.  After all, SARE cases (such as the JTRE Debtor case) are

required to proceed in an expedited manner, or they risk being dismissed for cause.

55.     Ultimately, it is evident that a weighing of the applicable factors leads to the

conclusion that these Chapter 11 Cases were filed in good faith and should not be dismissed.  The

totality of the facts and circumstances reveals that the Debtors' petitions serve the valid bankruptcy

purpose of preserving and selling the JTRE Debtor's valuable asset, the Property, and that the

cases were not filed merely to leverage some tactical advantage.

## II.     THE LENDER'S CHOSEN REQUEST TO LIFT THE AUTOMATIC STAY SHOULD BE DENIED AS SUCH RELIEF IS NOT WARRANTED.

56.     Section 362(a)(1) of the Bankruptcy Code contains an automatic stay provision,

which prohibits the commencement or continuation of an "action or proceeding against the debtor

that was or could have been commenced before the commencement of the case under this title, or

to recover a claim against the debtor that arose before the commencement of the case under this

title . . . ."  "In addition to providing the debtor with a 'breathing spell,' the stay is intended to

replace an unfair race to the courthouse with an orderly liquidation procedure designed to treat all

creditors equally."  *U.S. v. Nicolet, Inc.*, 857 F.2d 202, 207 (3d Cir. 1988).

57.     Section 362(d) of the Bankruptcy Code provides that a party in interest may request

relief from the automatic stay, "such as by terminating, annulling, modifying, or conditioning such

stay (1) for cause, including the lack of adequate protection of an interest in property of such party

in interest . . . ."

58.     The Bankruptcy Code does not define "cause" under Section 362(d).  Cause "is an

intentionally broad and flexible concept which must be determined on a case-by-case basis."  *In

re Schaffer, 597* B.R. 777, 789 (Bankr. E.D. Pa.), *aff'd sub nom. Matter of Schaffer*, 606 B.R. 228

(E.D. Pa. 2019), *aff'd sub nom. In re Schaffer*, No. 19-3664, 2020 WL 2529371 (3d Cir. Jan. 24,

2020) (citation omitted).

59.    "[T]he moving party bears the burden of establishing cause justifying relief from

the stay.  If the moving party meets this burden, the burden then shifts to the debtor to establish

the absence of cause." *In re Schaffer*, 597 B.R. at 789–90 (citation omitted).  However, "whether

cause exists to terminate the automatic stay under § 362(d)(1) is committed to the sound discretion

of the bankruptcy court and is determined by examining the totality of the circumstances." *Id.*

(citation omitted).

60.    The Lender contends that a chapter 11 petition filed in bad faith is "cause" to grant

relief from the automatic stay under § 362(d)(1).  The Lender has not met its burden of establishing

a bad faith filing, as shown in Section I below.  Hence, the Lender is not entitled to alternative

relief in the form of relief from the automatic stay on the basis of the same flawed arguments.

61.    Additionally, contrary to Lender's argument, the Lender is adequately protected.  It

is well-settled that "[t]he existence of equity above the secured party's interest which provides an

'equity cushion' to the secured party may, in a given case, provide adequate protection." *In re

Dunes Casino Hotel*, 69 B.R. 784, 794 (Bankr. D.N.J. 1986) (internal citations omitted).

62.    With regard to value, "[i]n an action to lift the automatic stay, the party seeking

such relief has the burden of proof on the issue of the debtor's equity in the collateral . . . ." *First

Valley Bank v. Brown & Brown (In re Brown & Brown)*, 27 B.R. 5, 6 (Bankr. M.D.Pa. 1982)

(internal citations omitted).  Here, the Lender has simply not met its burden.  Indeed, as noted in

the Goldwasser Declaration, the value of the Property (using a fully marketed sale process as

opposed to fire sale) is approximately $25 million.[2] As for the Lender's assertion that it is owed

---

[2] This amount was communicated by the Debtor's broker whom it will be seeking to retain in short order.

over $28 million, the Debtors disagree.  Rather, the Debtors believe the amount outstanding under the Loan Documents to be less than $20 million.[3]

63.    Additionally, the Lender is simply wrong that the Property is not necessary for an effective reorganization.  The Property is the JTRE Debtor's main asset, without which, there is no reorganization.  For the Lender to argue anything to the contrary is disingenuous.

64.    At bottom, the Debtors believe that the Lender is adequately protected in these Chapter 11 Cases and will be so protected during the duration of the sale process, which the Debtors anticipate commencing in short order.  The anticipated sale process will certainly inure to the benefit of the Lender as the largest creditor of the JTRE Debtor and will certainly garner a higher and better value than a fire sale on the courthouse steps.

65.    Because the Lender has not established the existence of cause justifying terminating, annulling, modifying, or conditioning the automatic stay, nor has it demonstrated that it is not adequately protected, the Court should deny the Lender's request under  §§ 362(d)(1) and (d)(2) of the Bankruptcy Code in its entirety.


*[remainder of page intentionally left blank]*

---

[3] It is important to note that the In fact, the Debtors intend on commencing an adversary proceeding against the Lender in short order with regard to, among other things, lender liability.

## CONCLUSION

66.     For the foregoing reasons, the Court should deny the motion to dismiss or for alternative relief filed by the Lender in its entirety.

Dated:  March 28, 2024                    Respectfully submitted,

                                          **A.Y. STRAUSS LLC**

                                          By:___*/s/ Eric H. Horn*___
                                          Eric H. Horn, Esq.
                                          Heike M. Vogel, Esq.
                                          Maria A.G. Harper, Esq.
                                          290 West Mount Pleasant Avenue, Suite 3260
                                          Livingston, New Jersey 07039
                                          Tel. (973) 287-0966
                                          Fax  (973) 533-0127

                                          *Proposed Counsel to the Debtors and*
                                          *Debtors-in-Possession*