<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**Caption in Compliance with D.N.J. LBR 9004-1(a)**

Benesch, Friedlander, Coplan & Aronoff LLP
Michael J. Barrie (NJ No. 033262000)
Kevin M. Capuzzi (NJ No. 173442015)
Daniel N. Brogan (NJ No. 042592012)
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, NJ 07601-6323
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
kcapuzzi@beneschlaw.com
dbrogan@beneschlaw.com

*Counsel to CPIF MRA, LLC*

</td><td></td></tr>
</table>

| | |
|---|---|
| In re:<br><br>14 VESEY PARTNERS (DEL) LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-12086 (MBK)<br><br>Judge: Michael B. Kaplan |
| In re:<br><br>JTRE 14 VESEY LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-12087 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>**Hearing Date: April 4, 2024** |

**REPLY OF CPIF MRA, LLC IN SUPPORT OF ITS MOTION TO DISMISS THESE CHAPTER 11 CASES WITH PREJUDICE OR, IN THE ALTERNATIVE, <u>FOR RELIEF FROM THE AUTOMATIC STAY</u>**

CPIF MRA, LLC ("<u>Lender</u>"),[1] by and through its undersigned counsel, Benesch,

Friedlander, Coplan & Aronoff LLP, hereby submits this reply in response to the Debtors'

---

[1] Lender is the assignee and successor-in-interest to the original lender, CPIF Lending, LLC ("<u>CPIF Lending</u>" or "Original <u>Lender</u>"). On or about May 19, 2021, CPIF Lending assigned all of its right, title, and interest in, to, and under the Initial Loan Documents (as defined herein) to Lender. Unless expressly stated otherwise, references in this Motion to "Lender," shall refer, collectively, to CPIF MRA, LLC, and CPIF Lending, LLC.

*Objection to the Motion of CPIF MRA, LLC to Dismiss These Chapter 11 Cases with Prejudice or, in the Alternative, for Relief from the Automatic Stay* [D.I. 28] (the "Objection" or "Obj."), and in further support of its motion in support of the *Motion of CPIF MRA, LLC to Dismiss These Chapter 11 Cases with Prejudice or, in the Alternative, for Relief from the Automatic Stay* [D.I. 19] (the "Motion to Dismiss").[2]

For the reasons set forth herein and in the Motion to Dismiss, Lender respectfully requests that this Court (i) dismiss the chapter 11 cases of the above-captioned debtors (the "Debtors") for cause and with prejudice pursuant to sections 105(a), 305(a), 349(a) and 1112(b) of title 11 of the United States Code (the "Bankruptcy Code"), or, in the alternative, (ii) grant relief from the automatic stay pursuant to sections 362(d)(1) and (d)(2) of the Bankruptcy Code.

## PRELIMINARY STATEMENT

1.      The filing of these Cases is nothing more than a last gasp effort by the Debtors to exploit the bankruptcy process to delay the State Court Litigation and UCC Auction.  The Debtors' attempt to argue otherwise and suggest these Cases are "much more than a two-party dispute" fails to withstand scrutiny.  Indeed, in support of this argument, the Debtors offer only that they have fourteen (14) unsecured creditors with claims over $5 million.  This lone fact cannot overcome the reality that these Cases were filed in bad faith solely to trigger the automatic stay *less than fifteen minutes* before the UCC Auction commenced.

2.      The Debtors argue that the "totality of the facts and circumstances" should grant them time in chapter 11 to run a sale process for the Mortgaged Property.  The Debtors are wrong.

---

[2] That certain Motion filed on March 8, 2024, is incorporated herein by reference in its entirety, along with the declaration and exhibits in support thereof.  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

The underlying facts all lead to the inescapable conclusion that these Cases serve no valid bankruptcy purpose and should be dismissed.

3.      The Debtors first defaulted on the Loans over eleven months ago.  At no point, until the filing of the Objection, did the Debtors take any meaningful steps towards running a sale process.  The Debtors' position is further belied by the fact that no broker has been retained, their reliance on an unnamed broker who purportedly opined that a sale process "might" exceed $25 million (which still would not satisfy Lender's debt of over $28 million[3]), and no sale motion has been filed.

4.      Since filing these Cases five weeks ago, the Debtors have not even filed routine motions such as a joint administration motion or applications to retain professionals, let alone taken any action indicative of a good faith effort to pursue a sale process.  The Court should not countenance the Debtors' attempt to delay the legitimate efforts of Lender to enforce its rights while waiting for the Debtors to run a vague sale process that, at its best case, will not result in a full recovery for Lender and during which Lender is not, and will not be, adequately protected.

5.      Moreover, the Debtors' alleged reliance on a text message with a principal of Lender prior to the UCC Auction as justification for filing these Cases is another indication that these Cases are nothing more than a two party dispute.  The Debtors take this text message exchange completely out of context when accusing Lender of "reneging" on an adjournment of the planned UCC Auction.  As shown below, the Lender agreed to reschedule a phone call with the Debtors, not push out the UCC Auction.  At bottom, these Cases were filed to prevent Lender from exercising its rights and nothing more.

---

[3]      It is unclear why the Debtors "believe the correct amount outstanding under the Loans to be less than $20 million," since the Debtors do not elaborate the basis for this claim. *See* Obj. ¶ 24. Lender notes that the Objection appears to ignore the third secured loan encumbering the Property, evidenced by the Extension Loan Agreement, with an original principal balance of $2,039,798.77.

6.      As further discussed herein, the Objection should be overruled, and Lender's

Motion should be granted so that these chapter 11 Cases are dismissed with prejudice or, in the

alternative, grant Lender relief from the automatic stay to conduct the UCC Auction and continue

the State Court Litigation.

**RESPONSE**

**I.      THE BANKRUPTCY CASES SHOULD BE DISMISSED BECAUSE THEY WERE FILED IN BAD FAITH, DO NOT SERVE A VALID BANKRUPTCY PURPOSE, AND THERE IS NO HOPE FOR REHABILITATION OR REORGANIZATION.**

7.      The Debtors do not dispute that three out of the six factors for dismissal as bad faith

filings from *In re Y.J. Sons & Co.* are present.  212 B.R. 793, 802 (D.N.J. 1997) (listing factors).

Specifically, the Debtors do not, and cannot, refute that (i) the Mortgaged Property is the Debtors'

sole asset; (ii) the Debtors have no employees; and (iii) the Debtors are subject to State Court

Litigation.  Additionally, while disputed by the Debtors, it is evident that the Debtors' financial

problems are, at bottom, a two-party dispute between the Debtors and Lender which can be

resolved in the State Court Litigation; and the timing of the Debtors' filing—***less than fifteen***

***minutes*** before the scheduled UCC Auction—evidences an intent to delay or frustrate Lender's

legitimate efforts to enforce its rights.  As such, and contrary to the Debtors' Objection, five out

of the six *Y.J. Sons* factors are met, warranting dismissal.

8.      As an initial matter, the Debtors, and not Lender, bear the burden of establishing

that the petitions were filed in good faith.  *See In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197,

211 (3d Cir. 2003) (discussing dismissal of chapter 11 filing under Bankruptcy Code section

1112(b) and stating that "[t]he debtor bears the burden of establishing good faith") (citing *In re*

*SGL Carbon Corp.*, 200 F.3d 154, 162 n.10 (3d Cir.1999)).  The Debtors have not met their burden.

4

9.     The Debtors' Objection fails to adequately establish that the petitions were filed in good faith and therefore the Cases should be dismissed under section 1112(b) of the Bankruptcy Code.

**A.     The Debtors' Financial Problems Are, At Bottom, a Two-Party Dispute Between the Debtors and Lender Which Can Be Resolved in State Court.**

10.     The Debtors' bankruptcy proceedings are a two-party dispute that has already been ongoing as evidenced by the State Court Litigation and the UCC Auction.  *See* Shields Dec. ¶¶ 28-38, Exs. 14-18.[4]

11.     Courts generally hold in these circumstances that such a dispute does not belong in bankruptcy court.  *See, e.g.*, *In re GVS Portfolio I B, LLC*, 2021 WL 2285285, at *9 (holding that "this is certainly a dispute between the Debtor and [its secured creditor]," and "nothing that need happen in this Court that cannot happen in state court"); *In re Scarborough-St. James Corp.*, 2015 WL 5672628, at *2 (Bankr. D. Del. Sept. 24, 2015) (dismissing a "two-party dispute" between debtor and its landlord relating to entitlement to rents from debtor's sole material real estate asset); *Jameson*, 461 B.R. at 299 (dismissing case where Court found it "involve[d] only a two-party dispute" between two competing lenders); *In re SB Properties, Inc.*, 185 B.R. 198, 205 (E.D. Pa. 1995) (dismissing debtor's petition where filing was "no more than a thinly veiled litigation tactic in a two party . . . dispute."); *In re Asanda Air II LLC*, 600 B.R. 714, 722 (Bankr. N.D. Ga. 2019) ("[T]his reorganization essentially involves the resolution of a two-party dispute . . . as the Debtor's 'financial problems' stem solely from [a] [s]tate [c]ourt [p]roceeding and the underlying contract dispute [with the debtor's sole major creditor]").

---

[4]     This is particularly true here, since, had the bankruptcy filings not stayed the UCC Auction, Lender would have purchased the equity of JTRE 14 Vesey, resulting in the creditors of that debtor enjoying a new, well-capitalized equity owner focused on stabilizing the property and maximizing its value.

12.     That the Debtors have other, smaller unsecured creditors is immaterial.   The Debtors do not allege, nor is there any evidence, that any of the unsecured creditors have been exerting pressure on or commenced collection efforts against the Debtors prior to the bankruptcy filing, except for the mechanic's liens listed in the Motion to Dismiss.  *See In re Jer/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 299 (Bankr. D. Del. 2011) (the debtor's creditors, "if they [even] are creditors, were exerting no pressure on [the debtor] before the filing").  Indeed, the unsecured claims are less than 18% of Lender's secured claim and almost certainly would have benefitted from the Lender purchasing JTRE 14 Vesey's equity at the UCC Auction.

13.     The Debtors' reliance on *In re EnCap Golf Holdings, LLC*, 2008 WL 4200324, at *8 (Bankr. D.N.J. Sept. 4, 2008) is misplaced.  In *EnCap*, the Debtor had over $350 million in secured debt held in multiple tranches and over $100 million in unsecured claims, which it hoped to address, in part, by addressing material environmental liabilities and consummating sale and purchase agreements that would result in over $200 million in sale proceeds.  *See id.*

14.     In *EnCap*, the first lien lender sought dismissal, but other creditors were actively involved in the case as well, and the court noted that it "is unusual for a motion to dismiss to be premised on a debtor's inability to file a plan when there is a pending creditor's motion to terminate the exclusivity period so that the creditor may file a competing plan." *Id.* at *9.  In fact, it was not the first-lien lender's action that led to the bankruptcy filing, but the actions of the environmental authority that caused the "precipitating factor," and the environmental authority supported EnCap remaining in bankruptcy. *Id.* at *7.

15.     Here, no other creditor has appeared in the Cases and the Debtors' capital structure is much more straightforward than that of *EnCap*: Lender holds an undersecured loan that encumbers all of the Debtors' property.  And unlike in *EnCap*, there are no material environmental

6

issues to resolve, as the collateral and sole asset is a building in Manhattan that has been vacant for over a year.  The precipitating factor for the filings was the planned UCC Auction.

16.     Thus, the factual background of these Cases makes clear that the Debtors' financial problems, and this bankruptcy, are nothing more than a two-party dispute between the Debtors and Lender: (i) first, the Debtors defaulted under the Notes and Mortgages (Shields Dec. ¶¶ 15-27); (ii) Lender initiated the State Court Litigation for breach of contract (*Id.* ¶¶ 28-30) and engaged Keen to conduct the UCC Auction and provided notice of the UCC Auction to the Debtors (*Id.* ¶¶ 31-32); (iii) two days before the UCC Auction, Vesey Partners filed the Vesey Complaint in the Supreme Court of the State of New York, County of New York, seeking a preliminary and permanent injunction and temporary restraining order enjoining Lender from conducting the UCC Auction, which was opposed by Lender (*Id.* ¶¶ 36-37); (iv) on the same day, the New York Supreme Court denied Vesey Partners' order to show cause seeking a temporary restraining order and injunction and, among other things, noted that "it is unclear why [Vesey Partners] waited until two days before the sale when it has known the collateral would be sold since the middle of January" (*Id.* ¶¶ 38-39);[5] and (v) finally, having failed to prevent the UCC Action, and only then, did the Debtors file these bankruptcy Cases, less than fifteen minutes before the UCC Auction was to occur (*Id.* ¶ 40).

17.     The Debtors' reason for filing these Cases is clearly driven primarily, if not solely, by the Debtors' dispute with Lender.  This factor weighs heavily in favor of dismissal of these Cases as well.

---

[5]     The Debtors seem to suggest that Lender should have given notice to them of the UCC Auction prior to January 26, 2024. *See* Obj. ¶ 30. However, under Section 9-612(b) of the Uniform Commercial Code, ten-day notice is commercially reasonable and sufficient to conduct an enforceable public auction. It is unclear why the Debtors believe Lender acted unreasonably by providing three times the amount of notice required by applicable law.

**B.      The Timing of the Debtors' Filings—Less than Fifteen Minutes Before the Scheduled UCC Auction—Evidences an Intent to Delay or Frustrate the Legitimate Efforts of the Debtors' Secured Creditor, Lender, to Enforce Its Rights.**

18.      As stated above and in the Motion to Dismiss, the Debtors filed their Cases mere *minutes* before the scheduled UCC Auction, only two days after Vesey Partners' request for a temporary restraining order and injunction was denied, and two days before the hearing on the Lender's motion to appoint a receiver in the State Court Litigation.  Courts have repeatedly held under similar circumstances that such timing is highly suggestive of bad faith.  *See, e.g.*, *In re Mondelli*, 2013 WL 1187098, at *4 (affirming bankruptcy court's dismissal of bad faith filing where petition was filed on the morning of the twice-adjourned sheriff's sale and based on the bankruptcy court's finding that "[i]t couldn't be more obvious [that the] debtor's motive in filing the [March 14 Petition] was to stay the [Sheriff's] sale. Again."); *Jameson*, 461 B.R. at 299-300; *United States Tr. v. Stone Fox Capital LLC* (*In re Stone Fox Capital LLC*), 572 B.R. 582, 586 (Bankr. W.D. Pa. 2017) (filing was in bad faith where bankruptcy proceeding commenced four days before sheriff's sale of collateral).

19.      Debtors allege that they "texted with the principal of [Lender] seeking to push out the foreclosure sale by one week, to which such said principal responded 'sure'."  Obj. ¶ 32. However, tellingly, the Debtors did not attach such text messages to the Objection or the Declaration of David Goldwasser.[6]  Indeed, that is because the text messages show that Lender never made such promise to the Debtors.[7]  The text messages show the Lender agreed to reschedule

---

[6]      The purported text messages, as sent to Lender by Mr. Goldwasser, are attached as **Exhibit A**.

[7]      As a practical matter, it strains credulity to believe that Lender would, on the evening before the UCC Auction, agree to "push out" the Auction by a week when it had already expended significant time and resources over a month advertising the Auction and marketing the Mortgaged Property, especially in light of the fact that Lender had spent considerable time and resources in opposing the Vesey Complaint to ensure that the Auction would go forward.

8

a phone call with the Debtors, not push out the UCC Auction or grant other adjournments.  And, even if Lender had agreed to adjourn the UCC Auction by one week (which it did not), the timing of these text message is irrelevant to Debtors' argument that these Cases were filed in good faith. These Cases were filed only minutes before the UCC Auction commenced to halt Lender's enforcement action.  Whether the UCC Auction was delayed or not is immaterial — the Debtors filed these Cases in bad faith to halt the UCC Auction and impose the automatic stay.  The Debtors' attempt to paint the Lender as a bad actor falls flat.[8]

20.    The fact that the Debtors filed their petitions mere minutes before the UCC Auction—and that they filed no affidavit, declaration, or other evidentiary support for their purported intent along with their petitions—leads to only one conclusion: the Debtors' sole purpose was to obtain and abuse the automatic stay. [9]

21.    Therefore, the temporal proximity between the Debtors' filing and the UCC Auction does indeed evidence the Debtors' intent to delay/frustrate Lender's legitimate efforts to enforce its rights.  This factor also weighs strongly in favor of a finding of bad faith.  As such, five out of the six *Y.J. Sons* factors are met, warranting dismissal of these Cases.

**C.    The Chapter 11 Cases Should Be Dismissed with Prejudice and For Cause Pursuant to Sections 105(a), 349(a), and 1112(b) of the Bankruptcy Code.**

22.    These bankruptcy Cases are nothing more than the Debtors' latest attempt in a long string of attempts to prevent Lender from enforcing its rights and conducting the UCC Auction. This is a textbook case of a bad faith filing for an improper purpose.  Indeed, the Debtors cannot, and do not, offer a legitimate explanation for why they waited to file their petitions until the

---

[8]    It is telling that counsel for Debtors never informed counsel for Lender of the supposed extension of the Auction prior to the filing of these Cases.  Surely if Debtors believed they had secured a one-week reprieve, they would have contacted Lender's counsel prior to filing these Cases.

[9]    The Debtors' assertion that the temporal proximity between the Debtors' filing and the UCC Auction is not relevant rings hollow, at best.  *See* Obj. ¶ 54.

morning after the New York Supreme Court denied Vesey Partners' order to show cause seeking

a temporary restraining order and less than ***fifteen minutes*** before the UCC Auction was to be

conducted.  Because of the Debtors' bad faith filing, Lender has suffered significant setbacks in

completing the appointment of a receiver in the State Court Litigation, which leaves the Mortgaged

Property without management, and has incurred significant enforcement costs, and faces the risk

of material diminution of the value of its collateral as a result of further delay.

       23.     The Debtors' claim of good faith in filing these Cases is further belied by the fact

that in the month since filing their petitions, the Debtors have not retained a broker—the one broker

cited in the Objection is not identified—and no sale motion has been filed.  The Debtors say that

they will retain a broker in "short order," which is a vague term that gives no comfort to Lender.

*See* Obj. at pg. 15 fn. 2.  Indeed, the Debtors have not even taken basic steps that one would expect

in a typical case like filing retention applications or moving for joint administration of these Cases.

The Debtors' plan to sell the Mortgaged Property appears non-existent and they should not be

afforded the protection of the automatic stay while leaving the Lender without adequate protection

and unable to enforce its legal remedies.

       24.     Finally, despite the Debtors' claims, it is unclear how these bankruptcies would

serve to "perserv[e] a going concern, *i.e.*, the [Mortgaged] Property[.]"  Obj. ¶ 47.  There are no

operations at the Mortgaged Property and no ongoing efforts to renovate or lease the Mortgaged

Property. The Debtors have abandoned the Mortgaged Property and are no longer actively

managing or protecting its only asset and the Lender's collateral.  Shields Dec., ¶ 25, Ex. 13.  The

Debtors have no source of cash or income, and the value of the Mortgaged Property faces the risk

of material diminution if the Debtors are allowed to continue to stymie Lender's efforts to preserve

the Mortgaged Property. *See Jameson*, 461 B.R. at 298-99. Indeed, but for the Lender's efforts, the Mortgaged Property would be uninsured. Shields Dec., ¶ 36.

25. As such, it is necessary for the Court to dismiss the Debtors' Cases with prejudice to prevent the Debtors from attempting to file a successive petition in this or another jurisdiction to further forestall the appointment of a receiver in the State Court Litigation, delay the UCC Auction, and otherwise frustrate Lender's rights with respect to Mortgaged Property.

26. Accordingly, Lender respectfully submits that the Court should order the dismissal of the Debtors' chapter 11 Cases for cause and with prejudice and prospectively enjoin any further filings by the Debtors to prevent any further harm to the Lender.

## II. IN THE ALTERNATIVE, IF THE COURT DOES NOT DISMISS THE BANKRUPTCY CASES, THE COURT SHOULD GRANT LENDER RELIEF FROM THE AUTOMATIC STAY.

27. As discussed in the Motion to Dismiss, "[f]iling bankruptcy in bad faith is 'cause' for relief under [] section 362(d)(1)." *Mother African Union Methodist Church v. Conference of AUFCMP Church* (*In re Conference of African Union First Colored Methodist Protestant Church*), 184 B.R. 207, 218 (Bankr. D. Del. 1995). The Debtors have filed their bankruptcy petitions in bad faith as discussed herein and in the Motion to Dismiss, and cause therefore exists to grant Lender relief from the automatic stay to conduct the UCC Auction.

28. Relief from the automatic stay is further justified under Bankruptcy Code section 362(d)(1) for "lack of adequate protection of an interest in property of" the Lender. *See* 11 U.S.C. § 362(d)(1).

29. Although "adequate protection," is not defined by the Bankruptcy Code, "section 361 states that it may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest

11

in such property." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (citing 11 U.S.C. § 341).

30.    As an initial matter, it is the Debtors' burden to establish adequate protection; not the Lender's burden to establish a *lack* of adequate protection.  S*ee* 11 U.S.C. § 362(g)(2); *Wilmington Savs. Fund Soc. v. 1025 Assocs., Inc.* (*In re 1025 Assocs., Inc.*), 106 B.R. 805, 810 (Bankr. D. Del. 1989).  The Debtors have failed to meet their burden in establishing that Lender is adequately protected.  Vesey Partners previously admitted the appraisal value of the Mortgaged Property is just $18.7 million and Lender's payoff totals over $29 million.[10]  *See* Shields Dec., ¶¶ 36-37, 41, Ex. 18, ¶ 59.

31.    That the Debtors allege that the value of the Mortgaged Property is "approximately $25 million" and that "the Debtors believe the amount outstanding under the Loan Documents to be less than $20 million" is of no moment.  *See* Obj. ¶ 62.  The Debtors do not provide an appraisal or even a declaration from their purported broker.  Rather, the Debtors only provide a declaration from Mr. Goldwasser, their vice-president-restructuring, alleging that an unnamed broker (that the Debtors have not retained), allegedly opined that the value of the Property exceeds $25 million.  *See* Obj. ¶ 15.  This statement strains credulity in the face of the Debtors' prior appraisal from less than a year ago that placed the value of the Mortgaged Property at just $18.7 million.  *See* Shields Dec., ¶¶ 36-37, 40, Ex. 18 ¶ 59.  Indeed, it is baffling to imagine how the value of the Property could have risen by more than $6 million in less than a year, since the Debtors have neglected and abandoned the Mortgaged Property (which they do not dispute), causing it to fall further into disrepair during this time and continuing to this day.

---

[10] It is of no moment that the Debtors now allege that Lender is owed "less than $ 20 million". (Obj. ¶ 62).  Again, Debtors provide nothing more than a bald assertion of the amount owed.

32.     And because the Debtors have not provided or offered any alternative form of adequate protection to Lender from the immediate deterioration of its collateral's value caused by the imposition of the automatic stay, Lender is entitled to relief from the stay under Bankruptcy Code section 362(d)(1).

WHEREFORE, for the reasons stated herein and in the Motion to Dismiss, Lender respectfully requests that the Court enter an order (i) substantially in the form attached as Exhibit 1 to the Motion to Dismiss, dismissing the chapter 11 Cases with prejudice; or (ii), in the alternative, granting Lender relief from the automatic stay to conduct the UCC Auction and continue the State Court Litigation; and (iii) granting such other and further relief that is just and proper under the circumstances.

Date: April 1, 2024

*/s/ Kevin M. Capuzzi*
Michael J. Barrie (NJ 033262000)
Kevin M. Capuzzi (NJ 173442015)
Daniel N. Brogan (NJ 042592012)
BENESCH, FRIEDLANDER, COPLAN
        & ARONOFF LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: mbarrie@beneschlaw.com
        kcapuzzi@beneschlaw.com
        dbrogan@beneschlaw.com

*Attorneys for CPIF MRA, LLC*

13

**CERTIFICATE OF SERVICE**

I, Kevin M. Capuzzi, hereby certify that on April 1, 2024, I caused a true and correct copy

of the foregoing *Reply* to be filed and served by electronic means via the Court's CM/ECF system

upon all parties registered to receive such service.

/s/ Kevin M. Capuzzi
Kevin M. Capuzzi (NJ 173442015)