<table>
<tr><td>

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY**
Caption in Compliance with D.N.J. LBR 9004-1(a)

**Benesch, Friedlander, Coplan & Aronoff LLP**
Michael J. Barrie (NJ No. 033262000)
Kevin M. Capuzzi (NJ No. 173442015)
Daniel N. Brogan (NJ No. 042592012)
Continental Plaza II
411 Hackensack Ave., 3rd Floor
Hackensack, NJ 07601-6323
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
kcapuzzi@beneschlaw.com
dbrogan@beneschlaw.com

*Counsel to CPIF MRA, LLC*

</td><td></td></tr>
</table>

| | |
|---|---|
| In re:<br><br>JTRE 14 VESEY LLC, *et al*.<br><br>Debtors. | Chapter 11<br><br>Case No. 24-12087 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>(Jointly Administered)<br><br>**Hearing Date: November 7, 2024 Requested** |
| In re:<br><br>PARK 28 PARTNERS LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-17234 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>(Joint Administration Requested) |
| In re:<br><br>W72 STREET PARTNERS LLC,<br><br>Debtor. | Chapter 11<br><br>Case No. 24-17236 (MBK)<br><br>Judge: Michael B. Kaplan<br><br>(Joint Administration Requested) |

**<u>CPIF MRA, LLC'S MOTION TO APPOINT A CHAPTER 11 TRUSTEE</u>**

CPIF MRA, LLC ("Lender"),[1] by and through its undersigned counsel, Benesch, Friedlander, Coplan & Aronoff LLP, hereby moves for entry of an order (substantially in the form attached hereto as Exhibit 1): (i) appointing a trustee for cause under 11 U.S.C. § 1104(a); and (ii) granting further relief as the Court may deem just and proper. In support of this Motion,[2] the Lender respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The Debtors initiated these Bankruptcy Cases in furtherance of ongoing litigation among the Lender, Debtors, and their principal, Jack Terzi, pending in the New York state courts.[4]

2.      Putting aside its acrimonious history with the Debtors, the Lender participated in good faith in a mediation process with the Debtors and, following months of negotiations, believed it had reached a global resolution establishing a consensual framework that would maximize the value of the Debtors' respective bankruptcy estates. The parties reached that deal months ago, in May 2024.

3.      To that end, the Court approved the parties' settlement on July 1, 2024, the Debtors employed a commercial real estate broker on June 20, 2024, and, with the support of the Lender, the Debtors each filed liquidating Chapter 11 plans on June 21, 2024 and August 20, 2024,

---

[1] Lender is the assignee and successor-in-interest to the original lender, CPIF Lending, LLC ("CPIF Lending" or "Original Lender"). On or about May 19, 2021, CPIF Lending assigned all of its right, title, and interest in, to, and under the Initial Loan Documents (as defined herein) to Lender. Unless expressly stated otherwise, references in this Motion to "Lender," shall refer, collectively, to CPIF MRA, LLC, and CPIF Lending, LLC.

[2] In support of this Motion, Lender has also contemporaneously filed the *Declaration of Robert Shields in Support of CPIF MRA, LLC's Motion to Appoint a Chapter 11 Trustee* (the "Shields Dec.").

[3] As context requires, capitalized terms used in the preliminary statement have the meaning given to such terms below.

[4] For a complete background of the disputes among the Debtors and the Lender, Lender refers the Court to, and incorporates by reference, the Background set forth in the Cash Collateral Motion (as defined below).

respectively. That's where all progress in these cases ceased. And since that time, it has become painfully obvious that the Debtors remain unwilling and incapable to bring these chapter 11 cases to a conclusion and that only a Chapter 11 trustee can do so.

4.      The grounds for appointing a Chapter 11 trustee are compelling. *First*, the Debtors' management permitted their property insurance to be cancelled for at least two of their three real properties, a violation of the parties' settlement. What is worse is that the Debtors knew about this cancellation for a considerable time but never bothered to notify the Lender or the Office of the United States Trustee, leaving the only assets of two of the Debtors unprotected against loss. And following Lender's discovery of this insurance cancellation, the Lender struggled to "force place" expensive insurance coverage mostly because the Debtors were largely uncooperative at first, and then slow to respond.

5.      *Second*, to add insult to injury, Lender also learned that the unearned premiums with respect to the canceled policies—*premiums the Lender paid* just months ago, on April 11, 2024—were "returned" to the Debtors. As far as Lender can tell, Mr. Terzi took these refunds without notifying the Lender and pocketed them.

6.      *Third,* as detailed below, Mr. Terzi is interfering with, obstructing, and delaying the sale process for the Debtors' real properties, another violation of the parties' settlement. Specifically, Mr. Terzi refuses to provide potential bidders typical market expected disclosures concerning the asbestos abatement work completed at 14 Vesey Street property, and he is prohibiting his Court appointed real estate brokerage professionals from going to market with an offering price or a bid deadline, frustrating the Debtors' real estate professionals and resulting in zero meaningful offers for the Debtors' real estate assets notwithstanding market interest.

3

7.      *Fourth*, in addition to the foregoing violations of the parties' settlement agreement, the Debtors have also breached that agreement in several other ways, including the following:

- The Debtors have failed to work with their court-appointed real estate professionals to establish an outside sale date for a sale of the Debtors' real estate assets;

- The receiver appointed for the 28th Street Debtors was never appointed custodian in that bankruptcy case;

- No taxes have been paid in connection with the 14 Vesey property since 2022, and there is over $442,000 overdue; and

- Although the Affiliate Debtors have circulated a budget for Lender's approval, to which Lender provided comments, none was ever filed with the Court.

8.      *Fifth*, nothing is happening in these cases.  Despite receiving a retainer from the Lender in connection with the filing of the Bankruptcy Cases, the Debtors' "Vice President of Restructuring," David Goldwasser, has taken no discernable action in these Bankruptcy Cases, lacked basic knowledge of the Debtor at the 341 meeting, and has not attended a single call with the Broker.  Jack Terzi routinely sends his brother Moris to those calls.  This utter lack of progress is unacceptable and represents additional grounds for dismissal.

9.      At bottom, the Lender can no longer support the Debtors' management remaining as the stewards of these bankruptcy estates and the appointment of a chapter 11 trustee is warranted and necessary. Mr. Terzi's post-petition misconduct with respect to the real property insurance not only violated the parties' global settlement, for which the Lender began exercising various remedies, but created an unjustifiable, undeniable, and substantial risk of loss for the entirety of the Debtors' bankruptcy estates. And the Debtors' wholesale failure to mitigate this risk (or even notify other stakeholders of this risk) demonstrates that Mr. Terzi and the Debtors are incapable of serving in a fiduciary capacity as debtors-in-possession. Combining these events with the Debtors' ongoing interference with the sale process, and their breaches of the Court-approved settlement

agreement with Lender demonstrates that neither the Debtors nor their management are capable of performing under the post-petition promises they have made to maximize the value of the bankruptcy estates.

10. They must be replaced.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion are proper under 28 U.S.C. §§ 1408 and 1409.

12. The statutory predicate for the relief requested herein is section 1104(a) of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*. (as amended, the "Bankruptcy Code).

## BACKGROUND

**I. PROCEDURAL BACKGROUND**

13. On February 28, 2024 (the "Vesey Petition Date"), each of 14 Vesey Partners (DEL) LLC ("Vesey Partners") and JTRE 14 Vesey LLC ("JTRE 14 Vesey" and together with Vesey Partners, the "Vesey Debtors") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in in this Court, thereby commencing certain of these bankruptcy cases (the "Bankruptcy Cases"). On July 19, 2024 (the "Affiliate Petition Date") each of Park 28 Partners LLC and W72 Street Partners LLC (together, the "Affiliate Debtors" and, collectively with the Vesey Debtors, the "Debtors") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code in in this Court, thereby commencing the remainder of the Bankruptcy Cases.

14. As of the date of this Motion, no prior request has been made for the appointment of a trustee or examiner and no statutory creditors' committee has been appointed.

## II.   PRE-PETITION DISPUTES BETWEEN THE VESEY DEBTORS AND THE LENDER

15.     For a complete background of the disputes among the parties, the Lender hereby incorporates by reference the *Debtors' Motion for Entry of an Order (I) Pursuant to 11 U.S.C §§ 105, 361, 362, 363, 503, and 507 and Fed. R. Bankr. P. 2002, 4001, and 9014 (A) Authorizing Debtors to Use Cash Collateral; (B) Granting Adequate Protection to Lender; and (II) Pursuant to 11 U.S.C. § 105 And Fed. R. Bankr. P. 9019 Joining the Affiliate Debtors to the Settlement by and Among the Vesey Debtors, the Lender and Jack Terzi and (III) Granting Related Relief* [Case No. 24-17234 (MBK), at D.I. 28 and Case No. 24-17236 (MBK), at D.I. 28] (the "Cash Collateral Motion").

## III.   MEDIATION AND SETTLEMENT

16.     On March 8, 2024, the Lender filed the *Motion of CPIF MRA, LLC to Dismiss These Chapter 11 Cases with Prejudice or, in the Alternative, for Relief from the Automatic Stay* [D.I. 19] (the "Motion to Dismiss"), by which it sought the entry of an order dismissing the Bankruptcy Cases of the Vesey Debtors with prejudice or, in the alternative, granting relief from the automatic stay. On March 28, 2024, the Debtors filed a response to the Motion to Dismiss [D.I. 27].

17.     On April 4, 2024, at the initial hearing on the Motion to Dismiss, the Bankruptcy Court ordered that the Motion to Dismiss and certain other pending motions be adjourned and also ordered that the parties engage in a mediation process (the "Mediation"). On April 8, 2024, the Court entered its *Order Directing Mediation and Its Procedures* [D.I. 41], which established certain procedures for the Mediation and appointed Albert Togut, Esq. (the "Mediator") as the Mediator.

18.     Mr. Togut was particularly well equipped to conduct the Mediation.  He has an extraordinary amount of experience with real estate bankruptcies, having represented Rockefeller Center and the Olympia & York's World Financial Center in their Chapter 11 reorganizations.  He has been a Chapter 11 or Chapter 7 trustee in many successful cases, including Kingston Square. He is currently the Chapter 11 trustee charged with selling Oleg Casini's former townhouse that is now on the market for more than $50 million.  And he has been practicing bankruptcy law for nearly fifty years.

19.     All of that experience mattered.  He was able to earn the trust of the Debtor and Jack Terzi as well as the Lender.  He did his own analysis of the competing claims that created a framework for reaching a settlement.  And both parties asked him to stay on to handle additional problems, if they arose.  He has been a neutral throughout.  If the Court grants this application, it is respectfully submitted that he would be an appropriate person to serve as Chapter 11 trustee and the Lender would have no objection to his appointment.  He is certainly well qualified and fully familiar with the parties and the properties to be sold.  There would be no learning curve and, in this case, time matters.

20.     On May 24, 2024, and continuing from time to time thereafter, the Debtors, Jack Terzi, and Lender, with each of their respective counsel of their choice present, participated in the Mediation at the Court's direction and engaged in settlement discussions regarding a global resolution between and among the Parties.

21.     As a result of the Mediation, the Vesey Debtors, Jack Terzi, and the Lender reached an agreement (the "Settlement"), the terms of which were memorialized in a term sheet (the "Term Sheet") and which was approved by the Bankruptcy Court by order entered on July 1, 2024 [D.I. 87] (the "Settlement Order"). A copy of the Term Sheet is attached hereto as Exhibit 2.

22.     The Mediation resulted in a resolution by and among the Parties regarding, among other things: (i) the Lender's Motion to Dismiss, (ii) the Lender's Claims; (iii) a standstill of all other contested matters and other litigation involving the Parties in the Bankruptcy Court and the State Court, including litigation related to the Affiliate Debtors; (iv) consensual sale procedures for a potential sale of the Vesey Property; and (v) the process by which the Affiliate Debtors commenced their Bankruptcy Cases in which the Affiliate Debtors will conduct sales of their own assets.

23.     As a result of the Mediation, among other things: (i) each of the Affiliate Debtors filed their own Bankruptcy Cases and sought to jointly administer their cases with those of the Vesey Debtors, which are already being jointly administered (*see* Case No. 24-12087 (MBK), at D.I. 101; Case No. 24-17234 (MBK), at D.I. 26; and Case No. 24-17236 (MBK), at D.I. 26); (ii) each of the Debtors applied for and received authorization to retain Cushman & Wakefield (the "Broker") to pursue a marketing and sale process of the Debtors principal real property assets (*see* Case No. 24-12087 (MBK), at D.I.s 73 and 86; Case No. 24-17234 (MBK), at D.I.s 7 and 20; and Case No. 24-17236 (MBK), at D.I.s 7 and 20); and (iii) the Debtors and the Lenders negotiated plans of liquidation for each of the property-owning Debtors (*see* Case No. 24-12087 (MBK), at D.I. 99; Case No. 24-17234 (MBK), at D.I. 31; and Case No. 24-17236 (MBK), at D.I. 31), each of which has been filed and is pending approval of the applicable disclosure statement as of the filing of this Motion.

24.     Finally, as contemplated by the Term Sheet, the Lender consented, subject to certain conditions, to the use of its Cash Collateral to administer the Affiliate Cases. To that end, on August 20, 2024, the Affiliate Debtors filed the Cash Collateral Motion.

25.     In the Cash Collateral Motion, the Debtors sought to join both Affiliate Debtors to the Term Sheet and to memorialize the terms of Lender's consent to the use of its Cash Collateral in the proposed attached thereto. The Cash Collateral Motion has not yet been heard by the Bankruptcy Court and remains pending.

26.     Suffice it to say, as a result of the seemingly successful Mediation and its immediate aftermath, the Lender believed these Bankruptcy Cases were finally making progress. That soon changed.

## IV.     THE DEBTORS' MANAGEMENT REVERTS TO PRIOR BAD BEHAVIOR

27.     Among other things, the Term Sheet requires that "[a]t all times, the Debtors and debtors in the Affiliate Cases will maintain their real property assets such that Lender's interest therein in adequately protected, including by *ensuring that such property is properly insured*, weatherized, and secured." Term Sheet, at p. 2 (emphasis added). It also provides that: "(i) if the Sale process fails for any reason or (ii) *the Debtors or [Jack] Terzi interfere with the Sale*, challenge Lender's Claims, or (iii) *the Debtors or [Jack] Terzi otherwise breach the terms of this Term Sheet* ((ii) and (iii) are collectively, a "Term Sheet Failure"), the Lender's Claims shall revert to the full amount the filed proofs of claim (plus any allowable postpetition fees, charges, and interest) (collectively, the "Filed Claim Amount"). Term Sheet, at pp. 6 – 7 (emphasis added).

28.     On September 9, 2024, Lender discovered on its own that months before—since as early as July 3, 2024—insurance coverage on **all** the Debtors' real properties was cancelled and, at that time, none of the Mortgaged Properties were insured. *See* Shields Dec., at ¶ 2, and Ex. A. This constituted a Term Sheet Failure and a failure of each Debtor to meet their respective fiduciary obligations as a debtor-in-possession.

29.     Following Lenders' discovery that insurance lapsed, the Debtors initially stonewalled Lender's efforts to force place insurance coverage. *See* Shields Dec., at ¶ 5. For

9

example, notwithstanding Lender's numerous requests for information to force place insurance, such as loss runs, the Debtors refused to comply for several days. *See* Shields Dec., at ¶ 5, and Ex. B.

30.     More egregious than the insurance cancellation and the Debtors' failure to notify anyone that all of their valuable real estate assets were uninsured, however, was that Lender also learned that the unearned premiums with respect to the canceled policies were "returned" to the named insured (*i.e.*, the Debtors), through their representative Morris Terzi, even though it was the Lender who paid the policy premiums just months before. *See* Shields Dec., at ¶¶ 8 – 10, and Ex. C. The Debtors never told anyone of their receipt of the returned premiums. *Id.* And notwithstanding repeated demands, Lender is still "in the dark" regarding who took these funds. Based on the Vesey Debtors' monthly operating reports for the month of May and June,[5] which omit any information concerning these policy refunds, it appears that the Terzis have absconded with them.

31.     Based upon these violations of the parties' settlement, on September 12, 2024, the Lender informed the Debtors that the failure to maintain insurance constituted a Term Sheet Failure under the Term Sheet, withdrew its consent for the Affiliate Debtors to use Lender's Cash Collateral, and demanded the Debtors immediately turn over the misappropriated funds. *See* Shields Dec., at ¶ 8, and Ex. D.  Only after the Debtors received this notice did they make any effort to assist with the placement of insurance upon the estates' assets. Even then, it was only after several days of diligent effort by the Lender and its counsel that, on October 2, 2024, insurance was finally in place on all of the Debtors' properties. *See* Shields Dec., at ¶ 6.

---

[5] The Vesey Debtors have not yet filed monthly operating reports for the months of July or August, the Affiliate Debtors have filed no monthly operating reports since the commencement of their Bankruptcy Cases.

32.     The Debtors and Jack Terzi have also actively interfered with the Broker's efforts to run a value-maximizing sale process for the Debtors' real estate. For example, among other unconventional and disruptive directives, Jack Terzi has prohibited the Broker from setting an offering price for each of the Debtors' real properties, which is atypical in the industry. *See* Shields Dec., at ¶ 13.  That refusal has hampered the Broker's ability to obtain maximum value for the Mortgaged Properties because, among other reasons, it invites potential buyers to submit "low ball" or disincentivizes them from submitting any offers at all resulting in delays and depressed values. The effect of this either sets the "market" artificially low, encouraging under-market offers, or encourages potential bidders to not submit any offers because they perceive the seller, here the Debtors, as lacking conviction to sell or being unrealistic to market pricing.

33.     Jack Terzi has also prevented the Broker from setting a deadline to receive offers on any of the Mortgaged Properties. *See* Shields Dec., at ¶¶ 13 – 14, and Ex. E.  Without a deadline, potential buyers are disincentivized from submitting timely bids, resulting in a perception that there is a lack of interest for the asset. *See* Shields Dec., at ¶ 13.

34.     Upon information and belief, the Broker has scheduled at least 18 showings for 14 Vesey, at least 6 showings for Park 28, and at least 8 showings for W 72 Street with many parties expressing interest in the assets. To date, upon information and belief, the Broker has received no formalized, competitive, written offers on Park 28 and W 72 Street and only one written offer on 14 Vesey, which offer was not competitive.

35.     Moreover, with respect to 14 Vesey, Jack Terzi has asserted he performed an abatement with respect to asbestos that was located at this property. *See* Shields Dec., at ¶ 15. Despite repeated demands, he has not produced any paperwork demonstrating such abatement was

11

completed, even though Lender paid the contractors for this work. *Id.* Producing this paperwork will affect interest and pricing with respect to the sale. *Id.*

36. Terzi's obstruction of the sale process is also a violation of his and the Debtor's obligations under the Term Sheet.  As discussed, above it is a Term Sheet Failure for the Debtors or Terzi to interfere with the Sale. *See* Term Sheet at p. 2.  The Term Sheet also requires that Terzi and the Debtors work in consultation with the Broker to establish an "Outside Date" by which all of the Debtors' real estate assets must have been sold and the sales approved by final order of the Bankruptcy Court.  Terzi has refused to do so. *See* Shields Dec., at ¶ 13.

37. By refusing to establish an offering price, to set a deadline for bids (or even an Outside Date under the Term Sheet), and to produce proof that the asbestos abatement has been completed, Jack Terzi has created an environment that actively discourages buyers from moving with alacrity and submitting timely, competitive bids and encourages potential bidders to sit on their hands and submit non-competitive offers, all while the Mortgaged Properties sit in an environment where the real estate market at large is losing value.

38. The Term Sheet also requires that "**[p]romptly** after filing the Affiliate Cases, each Affiliate Debtor shall commence a parallel marketing and sale process…."  Term Sheet, at p. 5. While the Debtors have retained the Broker, as discussed above, their management has largely stymied the Brokers efforts.  Equally troubling, no motion to approve sale or bidding procedures has been filed in any of the Bankruptcy Cases.  In fact, it was not until October 21, 2024 that the even circulated proposed, draft bidding procedures—which drafts were only for the Affiliate Debtors, not the Vesey Debtors, and were still without either a bid deadline or an Outside Date.

39. Indeed, the Debtors and their management seem incapable of even the most-basic procedural administration of these Chapter 11 Cases.  For example, the Term Sheet required that

"[a]s a required 'first day' motion" each of the Affiliate Debtors seek an order of the Bankruptcy Court (i) approving the Affiliate Debtors' stipulations to the Lender's claims and the validity, priority, and enforceability of the Lender's security interest and (ii) confirming that the Lender may credit bid its secured claim. *See* Term Sheet, at pp 5 – 6. That motion was not filed as a "first day" motion, but instead was filed over a month into the case and, even then, only as a result of the Lender's intervention. Likewise, the Term Sheet requires that the Debtor prepare and file budgets for each of the Affiliate Debtor's cases. *See* Term Sheet, at p. 4. The Debtors did prepare a budget, to which the Lender provided comments, but that budget still has not been filed. The Term Sheet also requires the Debtors to cause the receiver appointed in the state court over the assets of Park 28 Partners LLC to be appointed as a "bankruptcy custodian" in the applicable Bankruptcy Case. No such motion has been filed to date.

40.     At bottom, the Debtors' administration of their cases shows a pattern of disinterest, delay, and disregard for their obligations. Indeed, the parties who could and should be moving this case along have not done so: (i) the Debtors' "Vice President of Restructuring," David Goldwasser, has taken no discernable action in these Bankruptcy Cases, demonstrated a complete lack of knowledge about the Debtors during the 341 meeting, and has not attended a single call with the Broker—despite the fact that the Lender funded $10,000.00 for his retainer on or about July 19, 2024; and (ii) Jack Terzi routinely sends his brother Moris to the calls with the Broker in his stead and, when he does attend, as discussed above, is more of an impediment than a benefit. *See* Shields Dec., at ¶¶ 12 and 16. The Chapter 11 Cases are adrift and no responsible party is at the wheel.

41.     Finally, it has come to the Lender's attention that that debtor JTRE 14 Vesey LLC has not paid made a payment to the New York City Department of Finance for its outstanding

13

property taxes since at least 2022 and currently owes in excess of $442,000 in back taxes, penalties and interest.  *See* Shields Dec., at Ex. F.

42.     This return to a pattern of the Debtors' mismanagement has forced the Lender to bring this Motion and seek appointment of a chapter 11 trustee.  The parties are fortunate, however, that an experienced and independent third party—the Mediator—has already been appointed by the Court and is ready and able to step in to put these Bankruptcy Cases back on the right path.

**RELIEF REQUESTED**

43.     By this Motion, the Lender seeks entry of an order directing the appointment of a chapter 11 trustee in these Bankruptcy Cases to manage the business and affairs of the Debtors pursuant to Section 1104(a) of the Bankruptcy Code.

**BASIS FOR RELIEF**

44.     "One of the painful facts of bankruptcy is that the interests of shareholders become subordinated to the interests of creditors." *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). This means that, in bankruptcy, the debtor transforms from a fiduciary for equity to a fiduciary for creditors. *See In re Marvel Entm't. Corp.*, 140 F.3d 463, 471 (3d Cir. 1998). In that fiduciary role, a chapter 11 debtor-in-possession—and its management—must be honest brokers. *See Weintraub*, 471 U.S. at 355 ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (internal quotation omitted).

45.     Thus, the Bankruptcy Code presumes a debtor will adhere to its fiduciary duties and "refrain from acting in a manner which could damage the estate or hinder a successful reorganization." *Id.* Despite this presumption, however, there are checks and balances. Creditors

14

are empowered to seek the appointment of a trustee when, as here, a debtor's fiduciaries have abdicated their duties, impairing a successful, value-maximizing process. Specifically, Section 1104(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . ., and after notice and a hearing, the court shall order the appointment of a trustee—
>
> (1) for cause, including fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management . . ., or similar cause . . . or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

11 U.S.C. § 1104(a). The categories enumerated in 11 U.S.C. § 1104(a)(1) "cover a wide range of conduct" and, thus, are best described as illustrative, rather than exclusive. *Marvel*, 140 F.3d at 472 (internal quotations omitted). Fraud, dishonesty, incompetence, and gross mismanagement of a debtor's business affairs are all grounds for appointment of a chapter 11 trustee under Section 1104(a)(1) of the Bankruptcy Code. *See, e.g., In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir. 1989); *In re Colby Constr. Corp.*, 51 B.R. 113, 116-18 (Bankr. S.D.N.Y. 1985). The determination of whether cause exists is discretionary; it must be taken on a case-by-case basis, taking into account all relevant factors and the totality of the circumstances. *See Sharon Steel*, 871 F.2d at 1225, 1228.

46. As set forth below, both alternative bases for appointment of a trustee under Section 1104(a) are satisfied in this case. The conduct of the fiduciaries here, particularly the Terzi brothers, at best constitutes "incompetence, or gross mismanagement" of the Debtors and, at worst, constitutes "fraud." The record supports the for-cause appointment of a trustee under Section 1104(a)(1) for multiple reasons. Even setting aside the existence of cause, appointment of a trustee

is also warranted under Section 1104(a)(2), which "envisions a flexible standard." *Marvel*, 140 F.3d at 474. Here, the appointment of a trustee is in the interests of the Debtors' estates, including their primary creditor constituency—the Lender.

**I.      There is "cause" to appoint a trustee under Section 1104(a)(1).**

47.      As noted, the Court "shall" remove a debtor's management and appoint a chapter 11 trustee "for cause," when there is "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management[.]" 11 U.S.C. § 1104(a)(1); *accord Marvel*, 140 F.3d at 471. The statutorily enumerated examples of cause are non-exhaustive, and "acrimony" between a debtor's existing management and its creditors also supplies cause sufficient to appoint a trustee. *Marvel*, 140 F.3d at 472. Once cause is established, appointment of a chapter 11 trustee is mandatory. *Official Comm. of Asbestos Claimants* v. *G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 318 (3d Cir. 2004) ("If a court finds that the moving party has discharged this burden, it 'shall' appoint a trustee[.]"); *Sharon Steel*, 871 F.2d at 1226 (Section 1104(a) "mandates appointment of a trustee when the bankruptcy court finds cause"). This case is emblematic of the type of misconduct warranting appointment of a trustee. The Court must appoint one.

48.      **Fraud and Dishonesty.** A trustee must be appointed when the debtor's incumbent management is found to be, as here, "dishonest, not credible, incompetent, and completely untrustworthy to operate . . . and guide [the debtor] through . . . chapter 11 reorganization," because they "engaged in numerous secret, self-dealing transactions, and sacrificed [the debtor's] resources and reputation." *In re Vascular Access Centers, L.P.*, 611 B.R. 742, 769 (Bankr. E.D. Pa. 2020) (finding cause under Section 1104(a)(1) to appoint a chapter 11 trustee). Additionally, "[d]iversion of funds and misuse of corporate assets constitute fraud or dishonesty sufficient to warrant appointment of a trustee" under Section 1104(a)(1). *In re PRS Ins. Grp., Inc.*, 274 B.R. 381, 385 (Bankr. D. Del. 2001); see also id. at 386 (appointing a trustee when "there was little evidence

16

presented by the [d]ebtor to explain th[e] transfers" of funds from the debtor to other companies); *Sharon Steel*, 871 F.2d at 1228 (finding a trustee warranted under Section 1104(a)(1) when the debtor's "management appears to have engaged . . . in a systematic syphoning of [the debtor's] assets to other companies under common control," as "such behavior raises grave questions about current management's ability to fulfill its fiduciary duty as debtor-in-possession to creditors"). These circumstances are present here.

49.     As discussed above, the Lender learned that the unearned premiums with respect to the canceled insurance policies were "returned" to the Debtors through the Terzis, despite the fact that it was the Lender and not the Debtors who paid those premiums. *See* Shields Dec., at ¶¶ 8 – 11. Those funds were never returned to the Lender, the Receiver, or the estate. *See* Shields Dec., at ¶ 11. Nor was the Lender or the Receiver informed of the cancellation of the policies or the "return" of the funds advanced. *Id.* As far as Lender can discern, the Terzis have absconded with those funds. This diversion of estate or creditor funds is, even generously, an act of fraud warranting the appointment of a chapter 11 trustee.

50.     **Incompetence or Gross Mismanagement.** Even setting aside the misappropriation of the returned insurance premiums, the Debtors' incompetence and gross mismanagement warrants appointment of a chapter 11 trustee.

51.     As discussed above, insurance coverage on **all** the Debtors' real properties was cancelled and allowed to lapse for months. *See* Shields Dec., at ¶ 2. Indeed, the Debtors never disclosed this lapse to the Lender and it was only after the Lender's independent discovery that insurance lapsed and despite the Debtors' efforts to prevent Lender from force placing insurance that insurance over the Mortgaged Properties was finally restored. *See* Shields Dec., at ¶¶ 4 – 7. This failure to maintain insurance and the Debtors' efforts to conceal same is an independent basis

17

upon which the Court can find "cause" to appoint a chapter 11 trustee. *See In re Plaza de Retiro, Inc.*, 417 B.R. 632, 642 (Bankr. D.N.M. 2009) (finding that the "insurance lapse and subsequent concealment was gross mismanagement at best or a lie at worst.").[6]

52.     But the Debtors' gross mismanagement does not end with the failure to maintain proper insurance. Instead, as discussed above, the Debtors and Jack Terzi have also actively interfered with the Broker's efforts to run a value-maximizing sale process for the Debtors' real estate. Specifically, Jack Terzi has refused to allow the brokers to set an offering price for each of the Mortgaged Properties and prohibited the Broker from setting a deadline to receive offers on any of the Mortgaged Properties. *See* Shields Dec., at ¶¶ 13 – 14, and Ex. E.  He has also failed, despite repeated requests, to provide proof of the asbestos remediation that he asserts was completed at the 14 Vesey property.  *See* Shields Dec., at ¶ 15.  Finally, he has refused to cooperate with broker to establish an Outside Date for the sales and to timely file motions to approve any sale and bidding procedures in these Bankruptcy Cases.  These refusals have created an environment that actively discourages buyers from moving with alacrity and submitting competitive bids. Instead, potential bidders are incentivized to sit on their hands and submit non-competitive offers, all while the Mortgaged Properties sit in an environment where the real estate market at large is losing value. This active interference with the sale process is, at the very least, gross mismanagement and creates an independent basis for appointment of a chapter 11 trustee. *See, e.g. In re Circulatory Centers of America, LLC* 579 B.R. 752, 764 (Bankr. W.D. Pa. 2017) (finding that self-dealing and interference by Debtors' management with the sale process represented cause for appointment of a chapter 11 trustee).

---

[6] A failure to maintain insurance also expressly constitutes "cause" to dismiss or convert a case under 11 U.S.C. § 1112(b)(4)(C).

53.     Parallel to the Debtor's interference with the outside-of-court progress on the Sale, they have also failed to take the necessary steps in the Bankruptcy Court to prosecute the sales of their assets. Indeed, no motion to approve sale or bidding procedures has been filed in any of the Bankruptcy Cases.  And, it was not until October 21, 2024 that the Debtors' counsel even circulated proposed, draft bidding procedures—which drafts were only for the Affiliate Debtors, not the Vesey Debtors, and were still without either a bid deadline or an Outside Date.  Eight months into these Bankruptcy Cases and nearly four months since the Term Sheet was approved, that is too little too late.

54.     Nor can the Debtors or their management attend to even the most-basic procedural administration of these Chapter 11 Cases.  For example, the motion stipulating to the Lender's claims, liens, and rights to credit bid, which was required by the Term Sheet to be filed as "first day" motion, was instead filed over a month into the case and, even then, only as a result of the Lender's intervention.  Likewise, the Debtor has failed to file any budgets for each of the Affiliate Debtor's cases, despite the Lender providing comments to same.  Finally, the Debtors have failed to take any discernable steps to cause the receiver appointed in the state court over the assets of Park 28 Partners LLC to be appointed as a "bankruptcy custodian" in the applicable Bankruptcy Case.  This is also a violation of the Term Sheet.  At bottom, the Debtors' administration of their cases shows a pattern of disinterest, delay, and disregard for their obligations

55.     To sum up, the Debtors grossly mismanaged their affairs by, among other things, allowing their insurance to be cancelled and concealing that cancellation, actively interfering with the Broker's efforts to achieve maximum value for the Mortgaged Properties, and failing to pay their administrative obligations. That gross mismanagement is an independent basis upon which this Court can and should appoint a chapter 11 trustee.

56.     **Acrimony.** Though not specifically enumerated in Section 1104(a)(1), the Third Circuit has found acrimony between the debtor and its creditors to provide yet another basis for appointing a chapter 11 trustee, as such acrimony can impair an effective reorganization. *See Marvel*, 140 F.3d at 466-67, 472-74, 478 (affirming appointment of a trustee pursuant to Section 1104(a)(1) based on acrimony). Here, given (i) the well-documented dishonesty and pre-bankruptcy litigation between the Debtors and Lender, (ii) the Debtors' management's lack of transparency and concealment of its fiduciary breaches in the Bankruptcy Cases thus far, (iii) the Terzis' misappropriation of estate or creditor funds, and (iv) the Debtors' and Jack Terzi's active efforts to undermine the Broker's efforts to run a value-maximizing sale process, the likelihood of a return to acrimony between the two sides could not be greater. The only constructive pathway forward requires an independent, impartial, and ethical fiduciary.

57.     At the end of the day, the Lender is *the* principal stakeholder in these Bankruptcy Cases, and the primary beneficiary of much, if not all, of the value of these estates. Indeed, the Lender has valid, unavoidable, and uncontroverted liens on substantially all—if not all—of the Debtors' assets. The Lender's relationship with Debtors' management is inexorably broken and governed by an inherent distrust rooted in Jack Terzi's repeated dishonest actions and breaches of his fiduciary duties. Under these circumstances, maintaining the Debtors' existing management is simply unworkable and the acrimony and mistrust between Lender and the Debtors creates an independent basis to appoint a chapter 11 trustee. *See In re Peak Serum, Inc.*, 623 B.R. 609, 632–33 (Bankr. D. Colo. 2020) (finding acrimony and mistrust between debtor's management and its largest creditor resulted in a deadlock between the parties warranting appointment of chapter 11 trustee); *Marvel*, F.3d at 473-4 (a court may appoint a chapter 11 trustee based on "acrimony …

when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and creditor, or … when the parties begin working at cross-purposes) (internal quotations omitted).

58.     **Lack of Progress.**  As discussed above, none of the Debtors' management has not taken the actions necessary to make progress in these cases.  Indeed, any progress that has been made only occurred when the Lender begged one or more of the foregoing fiduciaries to do their jobs.  This fundamental lack of progress and lack of any foreseeable possibility that progress will be made if the status quo remains is also independent grounds to appoint a trustee.  *See, e.g. In re U.S. Min. Prod. Co.*, 105 F. App'x 428, 430 (3d Cir. 2004) (affirming bankruptcy court's *sua sponte* appointment of a Chapter 11 trustee "based on the length of time the proceedings had been pending, the size of the case, the contentious and acrimonious nature of the relationships among the parties, the lack of trust, the lack of progress, and the need for a neutral party to 'maximize value and construct a plan ... acceptable to creditors.'").

59.     Instead, a chapter 11 trustee is required to restore confidence in the process and allow the bankruptcy proceedings to go forward without continued mismanagement and without further acrimonious disputes over even the most basic of financial and operational information. Thus, based on the totality of the circumstances, there is clear cause to appoint a chapter 11 trustee pursuant to Section 1104(a)(1) of the Bankruptcy Code.

**II.     Appointing a trustee under Section 1104(a)(2) is in the interests of the Debtors' estates.**

60.     Alternatively, the Court should appoint a trustee under Section 1104(a)(2) of the Bankruptcy Code because doing so is in the overall interests of the Debtors' estates.

61.     In reaching that determination, the Court should "eschew rigid absolutes and look to the practical realities and necessities" of a debtor to "determine whether the appointment of a trustee is in the best interests of the estate." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010)

(also describing Section 1104(a)(2) as creating a "flexible" standard); *see also Marvel*, 140 F.3d at 474 (likewise describing the "flexible § 1104(a)(2) standard"). The Court should consider, among other things: (i) the "trustworthiness" of the debtor's management team, (ii) the debtor's "past and present performance" and prospects for rehabilitation, (iii) the "confidence"—or, here, the lack thereof—of the business community and of creditors in present management, and (iv) "the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *Vascular Access*, 611 B.R. at 765; *see also In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 304 (Bankr. M.D. Pa. 2016) (also analyzing these factors). Here, these factors, separately and collectively, warrant appointing a chapter 11 trustee.

62.    *First*, the Debtors' existing management team is untrustworthy. Guided by Jack Terzi, it has misappropriated estate property, violated the Debtors' obligations under the Court-approved Term Sheet, and demonstrated extreme incompetence. The Debtors' management should not be afforded further opportunities to inflict harm on the Debtors' estates and their respective creditors.

63.    *Second*, the prospects of value-maximizing process require the removal of existing management. Though the Lender initially agreed to allow the Affiliate Debtors to use the Lender's Cash Collateral and to pay certain expenses in the Vesey Debtors' cases, an express condition to that support was that the Debtors and Jack Terzi abide by their obligations under the Term Sheet. They have not, and the Lender has withdrawn its consent to the use of its Cash Collateral. Without such consent, there is no source of funds to administer the Bankruptcy Cases. Similarly, in *In re Ionosphere Clubs, Inc.*, the court appointed a trustee pursuant to Section 1104(a)(2) because, without one, the Unsecured Creditors' Committee would not have supported the debtor's continued use of escrowed unencumbered cash, causing "the estate [to] run short of operating

funds." 113 B.R. 164, 171 (Bankr. S.D.N.Y. 1990). "For this need alone," a trustee was warranted.

Id. (emphasis added). The same is true here. Without the installation of an independent fiduciary,

the Lender will not consent to the use of its collateral to fund these Bankruptcy Cases.

64. *Third*, allowing Jack Terzi to continue to interfere with the Debtors' sale process is inherently contradictory to the benefit of their estates. As outlined above, his refusal to allow the Broker to set an offering price—unheard of in the industry—or to set offer deadlines is manifestly depressing the value of the Debtors' principal assets. That the Lenders' claims are deeply underwater and, therefore, Jack Terzi should expect to receive little to no recovery supports an inference that he is acting out of spite, not for the benefit of the estates and their creditors. That too is a reason he should be immediately removed.

65. *Fourth*, allowing these cases to continue to linger without discernable progress is also inherently contradictory to the benefit of the Debtors' estates. Value will be lost from the delays that will surely continue if Debtor's management remains in control.

66. Given the totality of the circumstances, there can be no legitimate question that the scales tip in favor of appointing a chapter 11 trustee. Now is the time to act. The financial condition of the Debtors continues to deteriorate and without timely intervention, there is imminent risk of continued value dissipation. A neutral and professional third party in the form of a chapter 11 trustee will provide essential financial and operational controls that are lacking under present management. It will also allow the distrust and animosity to dissipate and allow the sale process to unfold unimpeded for the benefit of all creditors.

67. As a result, the Court should appoint a chapter 11 trustee under Section 1104(a)(2) of the Bankruptcy Code.

### WAIVER OF MEMORANDUM OF LAW

68.     Lender represents that the facts and circumstances set forth herein do not present novel questions of law, and, as such, respectfully request that this Court waive the requirement of filing a memorandum of law in accordance with Rule 9013-1 of the United States Bankruptcy Court, District of New Jersey.

### NOTICE

69.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for Region 3; (ii) counsel for the Debtors; (iii) all creditors listed on Debtors' schedules or that have filed proofs of claim against any of the Debtors; (iv) all holders of equity interests; (v) all parties that have entered an appearance and requested notice in the Bankruptcy Cases; (vi) the Mediator; (vii) all other parties entitled to notice pursuant to Bankruptcy Rules 2002 and 6004; and (viii) all persons who might reasonably be expected to be affected by the transaction contemplated herein. The Lender submits that no other or further notice is required.

### NO PRIOR REQUEST

70.     No previous request for the relief sought herein has been made to this Court or any other court.

24

## CONCLUSION

**WHEREFORE**, for all the foregoing reasons, the Lender therefore respectfully requests

that the Court enter an Order in the form attached hereto granting the Motion, appointing a chapter

11 trustee, and granting such other and further relief as is just and equitable.


Date: October 30, 2024

**BENESCH, FRIEDLANDER, COPLAN
& ARONOFF LLP**

 */s/ Daniel N. Brogan*
Michael J. Barrie (NJ 033262000)
Kevin M. Capuzzi (NJ 173442015)
Daniel N. Brogan (NJ 042592012)
1313 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
Email: mbarrie@beneschlaw.com
        kcapuzzi@beneschlaw.com
        dbrogan@beneschlaw.com

*Attorneys for CPIF MRA, LLC*